701 F.2d 511
 1 Soc.Sec.Rep.Ser. 274
 MISSISSIPPI HOSPITAL ASSOCIATION, INC., et al.,
Plaintiffs-Appellants Cross-Appellees,
v.
Margaret M. HECKLER, Secretary of Health & Human Services,
Defendant-Appellee,
B.F. Simmons, etc., et al., Defendants-Appellees Cross-Appellants.
 No. 82-4305.
 United States Court of Appeals,
Fifth Circuit.
 March 28, 1983.
 
 David W. Clark and George Q. Evans, Jackson, Miss., Ronald N. Sutter, Washington, D.C., for plaintiffs-appellants cross-appellees.
 Mary Lawrence Gervin, Asst. Atty. Gen., Thomas E. Childs, Jr., Sp. Counsel to Atty. Gen., Fulton, Miss., William R. Phillips, Jackson, Miss., for Miss. Medicaid Com'n, et al.
 Leila H. Carp, Office of Gen. Counsel, Baltimore, Md., for Heckler.
 Appeals from the United States District Court for the Northern District of Mississippi.
 Before WISDOM, REAVLEY and TATE, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 This action challenges the validity of the state reimbursement plan that governs payments to hospitals in Mississippi for inpatient services provided to Medicaid patients. It was brought by an association of Mississippi hospitals and several individual hospitals against the Mississippi Medicaid Commission and several state officials that developed the plan, and the Secretary of the federal Department of Health and Human Services that approved the plan. The district court granted a summary judgment, holding that the reimbursement plan was valid except for an amendment that removes legal costs and fees incurred by providers in suits against federal and state agencies administering the Medicaid program from the array of allowable costs.
 
 
 2
 The plaintiffs appealed the decision, claiming that the whole plan is invalid for numerous reasons. The state defendants filed a cross-appeal, claiming that the amendment disallowing recovery of legal costs is valid. We agree with the defendants on all issues, affirming the district court on the issues raised in the plaintiff's appeal, and reversing as to the issue raised in the cross-appeal.
 
 
 3
 I. BACKGROUND: THE FEDERAL MEDICAID PROGRAM AND
 
 
 4
 MISSISSIPPI'S MEDICAID INPATIENT REIMBURSEMENT PLAN
 
 
 5
 The Medicaid program is a cooperative federal-state program set up to provide medical services to the poor. While the federal government provides funding, the program is administered by each state in accordance with a state plan that must be approved by the Secretary of Health and Human Services. The federal statutes governing the program comprise Title XIX of the Social Security Act, 42 U.S.C. Sec. 1396 et seq. While participation in the program is voluntary, once a state chooses to participate it must comply with federal statutory requirements. Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784, 794 (1980).
 
 
 6
 The statutory provision most relevant to this case requires that a state plan for medical reimbursement must provide
 
 
 7
 for payment ... of the hospital ... under the plan through the use of rates (determined in accordance with methods and standards developed by the State) and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws ....
 
 
 8
 42 U.S.C. Sec. 1396a(a)(13)(A) (emphasis added). The italicized clauses are particularly in dispute.
 
 
 9
 Originally, states were required to reimburse hospitals for inpatient services provided to Medicaid patients on the basis of cost methodology used by the federal Medicare program. In response to concerns about spiraling costs, Congress amended Title XIX in 1972 to allow, and even encourage, each state to develop its own alternative reimbursement scheme. As explained in Alabama Nursing Home Association v. Harris, 617 F.2d 388, 392 (5th Cir.1980) [hereinafter Alabama Nursing Home ]:
 
 
 10
 Congress intended that state authorities in developing methodologies for reasonable cost related reimbursement have great flexibility in the areas of cost-finding and rate-setting. The legislative history indicates that states are to be free to experiment with methods and standards for payment that would be simpler and less expensive than the complex Medicare reasonable cost formula. See S.Rep. No. 92-1230, 92d Cong., 2d Sess. 287 (1972) .... Additionally, Congress intended that states have freedom both to define allowable cost items and to set a value on the reasonable cost of such items.
 
 
 11
 As explained further below, federal oversight of Medicaid reimbursement has diminished still further since the Alabama Nursing Home decision.
 
 
 12
 In 1981, Mississippi implemented an alternative reimbursement plan for inpatient hospital services. The plan establishes prospective per diem rates for each participating hospital which are based on each hospital's Medicaid costs for the previous year, adjusted to exclude costs disallowed under the Medicare program. The costs are divided into three components--capital costs, educational costs and operating costs--and the hospitals are divided into classes based on the number of beds in the facility.
 
 
 13
 The capital cost component is calculated by dividing total allowable capital costs from the prior year attributable to treatment of Medicaid patients by the number of Medicaid inpatient days, subject to an occupancy penalty if the hospital has an occupancy level less than a level specified for its class. The specified occupancy level varies with each bed-size class; for example, the level is 60% for the 0-50 bed class, and 75% for the 151-200 bed class.
 
 
 14
 The educational cost component is calculated by dividing the Medicaid share of the prior year's education cost, adjusted for hospital industry inflation, by the actual number of Medicaid inpatient days.
 
 
 15
 The operating cost component is determined by first apportioning Medicaid's share of the previous year's operating costs, adjusting for hospital industry inflation, separating the costs into labor and non-labor categories, and dividing by the number of actual Medicaid inpatient days. The labor cost per diem is adjusted by the SMSA Wage Index published in the Federal Register to account for variation in labor costs among urban and rural locations in the state. The most controversial part of the plan is that the adjusted labor cost per diem plus the non-labor cost per diem for each hospital is arrayed with the comparable cost figure for other hospitals in the same bed-size class from the least expensive to the most expensive, and the 80th percentile figure is then calculated. The 80th percentile of per diem operating cost rates acts as a ceiling on operating cost reimbursements within each class. In other words, hospitals whose per diem operating cost rate falls below the 80th percentile receive their actual allowable cost, while hospitals with operating costs in excess of the ceiling are paid the 80th percentile rate. The purpose of this ceiling is to encourage cost containment under the Medicaid program.
 
 II. STANDARD OF REVIEW
 
 16
 Mississippi's reimbursement plan is the product of research and policy decisions by federal and state agencies. These agencies are authorized by statute to develop Medicaid's payment schemes. The function and expertise of the federal courts in this sphere is limited, and our role does not extend to reweighing or rethinking the political and financial concerns behind a particular payment plan. A district court can, of course, decide whether federal law has been violated. Otherwise its review of non-adjudicatory federal agency action is limited to deciding whether the action is arbitrary or capricious. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); 5 U.S.C. Sec. 706(2)(A). A presumption of validity attaches to agency action, and the burden of proof rests with the party challenging such action. Alabama Nursing Home, 617 F.2d at 393. Although the answer is far from clear, we assume without deciding that by force of statutory or constitutional requirements, a district court is entitled to review the actions of a state agency administering federal Medicaid funding as it would review the actions of a federal agency. In reviewing an order of summary judgment, the court of appeals views the case in the same manner as the district court, asking whether there is any genuine issue as to any material fact and whether the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Bank of Commerce of Laredo v. City National Bank of Laredo, 484 F.2d 284, 289 (5th Cir.1973), cert. denied, 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974).
 
 III. ALLEGED STATE VIOLATIONS
 A. The Requirement of Findings
 
 17
 The plaintiffs argue that the state has failed to make findings or to provide a reasoned explanation for the rates established in the Medicaid plan. In particular, they allege a lack of findings or supporting reasons to justify the 80th percentile ceiling and occupancy level penalties.
 
 
 18
 There is some authority for the proposition that agencies are required to make findings sufficient for a court to decide whether agency action is valid. Generally, "[a] finding is a statement that summarizes what facts the agency is taking into account and a finding usually is not required for notice and comment rulemaking ...." 1 K. Davis, Administrative Law Treatise Sec. 6:13 at 506 (1978). Nevertheless, "the courts have begun to realize that they cannot say whether a factual determination is 'arbitrary or capricious' unless they know the basis for the facts found." City of Seabrook, Texas v. EPA, 659 F.2d 1349, 1359 (5th Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 51, 74 L.Ed.2d 57 (1982). See also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136, 153 (1971) (determining whether agency choice was arbitrary or capricious requires court to consider whether choice was based on a consideration of relevant factors.); Davis, supra, at 508 ("The vague answer, which may suffice for most practical purposes, is that a rule must be supported with facts ... when the rule would be arbitrary and capricious unless it is supported with facts.").
 
 
 19
 City of Seabrook, supra, involved similar allegations and facts. There, a federal agency, the Environmental Protection Agency, had approved a plan adopted by the state of Texas to comply with the Clean Air Act Amendments of 1977. We were presented with a
 
 
 20
 laundry list of the requirements of Sec. 172, 42 U.S.C. Sec. 7502, each accompanied by the naked assertion that there is no evidence to support the agency's conclusion that the requirement has been met. Petitioners have not even specified what facts they believe the agency was required to find. Thus, without any specific objection to the agency's determination, petitioners would put the agency and the court to the arduous task of explaining every step in a decade-spanning, technical and complicated decisional process. We think that petitioners must do more than this to merit review of their contentions.... When petitioners claim that an agency conclusion was arbitrary because there was no evidence to support it, they must at least identify the factual determination the agency was required to make and their basis for disputing it, bringing the countervailing evidence, if any, to the attention of the court.
 
 
 21
 659 F.2d at 1359-60.
 
 
 22
 In the guise of insisting on "findings," the plaintiffs are, in our view, trying to shift the burden of proof to the agency to justify the decisions it made. The ultimate details of the reimbursement plan are the result of a technical and time-consuming effort on the part of state and federal agencies. The defendants are not obliged in this suit to justify, for instance, why they arrived at an 80% ceiling instead of one set at 75% or 85%. The burden is on the plaintiffs to establish that the plan is arbitrary or capricious, or in violation of federal law, and this they have not done.
 
 
 23
 The record indicates that the 80 percentile ceiling was the result of careful and objective studies of cost data filed by Mississippi hospitals and of methods used by other states and the federal government. The obvious purpose of the ceiling is to encourage cost containment by penalizing the most expensive hospitals. It was based in part on an incredible range of costs incurred by hospitals. In the 1-50 bed category, for example, costs ranged from $66.52 to $377.09 per day. Since the rates are prospective, every hospital has an opportunity to recover its full costs as long as it can bring them below the 80% ceiling established by looking at the previous year's costs. The plaintiffs' argument that Mississippi hospitals were operating efficiently before the plan because they charge less than hospitals in other states is not compelling in light of evidence that labor and property costs are lower in Mississippi, and the state has relatively few large hospitals employing exceptionally sophisticated and expensive programs.
 
 
 24
 The occupancy penalty was likewise based on careful studies which revealed an occupancy rate statewide of only 63%. The data indicated that the number of beds per thousand in Mississippi was 5.29, while health planning officials have set a national goal of reducing capacity to 4 per thousand. The occupancy penalty applies only to the capital cost component and is justified as a way of assuring that Medicaid monies are not being used to subsidize idle capacity. We cannot say that the two years of study and plan development by the state and federal officials, or the final results of those efforts, indicate arbitrary or capricious decision-making.
 
 B. Alleged Improper Motives
 
 25
 The plaintiffs claim that the plan is invalid because it was created out of a desire to cut costs. They point to language in Alabama Nursing Home where we stated:
 
 
 26
 A state is not obligated to participate in the Medicaid program. However, once it has voluntarily elected to participate in the program, the state must comply with the federal standards. Inadequate state appropriations do not excuse noncompliance.
 
 
 27
 617 F.2d at 396 (citations omitted). This language should not be read to mean that states cannot consider cost efficiency in adopting reimbursement plans, or that courts should engage in some type of motivation analysis. It means only that budgetary constraints cannot excuse a failure to comply with federal standards.
 
 
 28
 The legislative history of the 1980 Boren amendment, which replaced the "reasonable cost-related" reimbursement rate standard for nursing and intermediate care facilities with the current "efficiently and economically operated facilities" standard, indicates congressional "intent that a State not develop rates under this section solely on the basis of budgetary appropriations." H.R.Conf.Rep. 1479, 96th Cong., 2d Sess. 154, reprinted in 1980 U.S.Code Cong. & Ad.News 5526, 5903, 5944. As one court has aptly noted, "[t]he Congressional admonition must be taken with a grain of salt since the subsequent federal cutbacks obviously had an impact on a state's financial health, a factor Congress could not have ignored." Coalition of Michigan Nursing Homes, Inc. v. Dempsey, 537 F.Supp. 451, 463 n. 41 (E.D.Mich.1982).
 
 
 29
 It is clear that in moving Medicaid away from Medicare reimbursement standards and encouraging alternative reimbursement plans in 1972, in eliminating the reasonable cost standard as applied to nursing homes in 1980 and hospitals in 1981, and in cutting Medicaid funding in 1981, Congress intended to encourage Medicaid cost containment. The legislative history of the Omnibus Budget Reconciliation Act of 1981, which set the current standards for hospital reimbursement rates found in 42 U.S.C. Sec. 1396a(a)(13)(A), states:
 
 
 30
 In eliminating the current requirement that States pay hospitals on a Medicare "reasonable cost" basis for inpatient services under Medicaid, the Committee recognizes the inflationary nature of the current cost reimbursement system and intends to give States greater latitude in developing and implementing alternative reimbursement methodologies that promote the efficient and economical delivery of such services.
 
 
 31
 H.R.Rep. No. 158, 97th Cong., 1st Sess. 293 (1981).
 
 
 32
 C. Compliance with Substantive Statutory Requirements
 
 
 33
 Under 42 U.S.C. Sec. 1396a(a)(13)(A), state Medicaid plans must provide for payment rates "which the State finds ... are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities ...." The plaintiffs assert that this requirement is not met because the occupancy penalty and bed-size classifications are irrational.
 
 
 34
 As explained above, the plaintiffs have failed to meet their burden of establishing that the occupancy penalty is irrational.
 
 
 35
 The plaintiffs' argument regarding the bed-size categories seems to be premised on the statement in their brief that "[t]he Mississippi plan classifies hospitals 'solely' according to 'bed size.' " At base, their contention is that the number of beds alone does not determine hospital costs per patient. There are at least five responses to this argument.
 
 
 36
 First, reimbursement under the plan is based primarily on each hospital's actual costs from the previous year, adjusted for inflation, and not on the number of beds. Costs of other hospitals of similar bed capacity come into play only in determining the 80th percentile ceiling and the occupancy penalty.
 
 
 37
 Second, within each class, an adjustment is made for labor costs--the largest and most variable operating cost component--in setting the 80th percentile ceiling. The labor cost adjustment is based on geographic location.
 
 
 38
 Third, the reimbursement plan has an exception process whereby hospitals may apply for a rate adjustment based on the addition of new and necessary services, major changes in the case mix, atypical case mix or types of service, extraordinary circumstances such as riots, strikes, or floods, costs of improvements incurred after rates were set, etc. The district court found that of forty requests for an exception, twenty-nine had been granted at least in part.
 
 
 39
 Fourth, the legislative history of the Medicaid statutes clearly indicates that Congress intended states to be free to establish rates on a geographic or class basis, as well as a facility-by-facility basis. Alabama Nursing Home, 617 F.2d at 392 (citing S.Rep. No. 1230, 92d Cong., 2d Sess. 287-88 (1972)); S.Rep. No. 139, 97th Cong., 1st Sess. 478, reprinted in 1981 U.S.Code Cong. & Ad.News 396, 744.
 
 
 40
 Fifth, we must take cognizance of the burdens imposed on governments in administering programs of this size and complexity. Relatively imprecise groupings or classifications used in large public health and welfare programs have been condoned where there were so few facilities "as to make it administratively inefficient to consider them separately," Diplomat Lakewood, Inc. v. Harris, 613 F.2d 1009, 1021 n. 24 (D.C.Cir.1979), or where any imprecision in the classification "was justified by its ease and certainty of operation." Weinberger v. Salfi, 422 U.S. 749, 780, 95 S.Ct. 2457, 2474, 45 L.Ed.2d 522, 547 (1975).
 
 
 41
 It is a well-known economic fact that costs often vary within an industry according to the scale of operations. The plaintiffs have failed to offer evidence that the bed-size classification used by the plan is irrational.
 
 
 42
 The plaintiffs complain that the rates established by the plan fail to "take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs" as required by 42 U.S.C. Sec. 1396a(a)(13)(A). This statute was enacted in 1981 primarily to encourage cost containment in the Medicaid program, as explained above. Congress nevertheless added the quoted language to assure that the needs of hospitals with special costs due to a disproportionate number of poor patients were taken into account. H.R.Rep. No. 158, 97th Cong., 1st Sess. 294-96 (1981).
 
 
 43
 The plaintiffs have failed to establish that any special costs have not or will not be taken into account. The Department of Health and Human Services accepted assurances dealing specifically with this statutory requirement based on the inherent reasonableness and adequacy of the rates and the opportunity of hospitals to file for an appeal if they can demonstrate an adverse impact attributable to serving disproportionate numbers of low income patients. A letter was sent to all hospitals participating in Medicaid informing them of this opportunity. In addition, the state adopted a plan amendment providing for rate adjustments specifically related to the disproportionate number requirement. The statute requires only that the plan "take into account" this factor, and the plan complies with this mandate.D. Compliance With Procedural Requirements
 
 
 44
 The state is accused of failing to comply with three federal procedural requirements. First, the plaintiffs claim that the state's Medicaid Commission failed to consult with the Medical Care Advisory Committee ("MCAC") when it developed the reimbursement plan.
 
 
 45
 Each state participating in Medicaid must establish an MCAC, an advisory committee consisting of physicians and other health professionals, members of consumer groups including Medicaid recipients, and state officials. 42 C.F.R. Sec. 431.12. The regulation requires that "[t]he committee must have opportunity for participation in policy development and program administration, including furthering the participation of recipient members in the agency program." Id., Sec. 431.12(e).
 
 
 46
 The district court found that Mr. B.F. Simmons, director of the Mississippi Medicaid Commission, regularly attended MCAC meetings, discussing the program's budget problems, and "seeking solutions for specific problems and soliciting general suggestions on cost containment alternatives." The record indicates that on November 19, 1980, James Townsend, MCAC member and chairman of the state's Technical Advisory Committee on Hospital Services, informed the MCAC that a study on hospital reimbursement was underway, and that on April 29, 1981, Mr. Simmons provided the MCAC with a copy of the plan.
 
 
 47
 Admittedly, the full-time professionals at the state Medicaid Commission and the Department of Health and Human Services worked out the specific details of the plan. The MCAC's role in its development was limited. However, as explained further below, the exact role of the MCAC in the Medicaid bureaucracy is far from clear. Given this fact, and the fact that the federal agency whose regulation requires MCAC participation has accepted state assurances that federal requirements have been met, and is actively defending the plan in this case, we find no procedural violation.
 
 
 48
 The hospitals claim a failure to comply with the then applicable public notice and comment procedures set out in 42 C.F.R. Sec. 447.205(c). The record reveals that a 350-plus word notice was published fully complying with this regulation. The notice outlined the substance of the plan in sufficient detail to allow interested parties to decide how and whether to seek more information on the plan's particular aspects. The agency was not required to publish every minute detail of the plan.
 
 
 49
 A final procedural complaint is that the state failed to make assurances that it had found that its rates "are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities," and "take into account the situation of hospitals which serve a disproportionate number of low income patients" as required by 42 U.S.C. Sec. 1396a(a)(13)(A) and accompanying regulations. The current statutory language requiring that assurances be made to the Secretary is not intended to be burdensome, and replaces a previously stricter requirement that the state's methods and standards be "reviewed and approved" by the Secretary. 42 U.S.C. Sec. 1396a(a)(13)(D) (repealed 1981). In enacting the new requirement, Congress expressed its intention that:
 
 
 50
 [T]he Secretary will keep regulatory and other requirements to the minimum necessary to assure proper accountability, and not to overburden the States and facilities with unnecessary and burdensome paperwork requirements. It is expected that the assurances made by the States will be considered satisfactory in the absence of a formal finding to the contrary by the Secretary.
 
 
 51
 S.Rep. No. 139, 97th Cong., 1st Sess. 478, reprinted in 1981 U.S.Code Cong. & Ad.News 396, 744.
 
 
 52
 The record indicates that the Department of Health and Human Services spent over 300 hours reviewing, evaluating, and recommending changes in the plan over a two year period. Its final acceptance of the plan makes specific references to state assurances that the plan meets the statutory requirements as to reasonable and adequate rates and hospitals serving a disproportionate number of low income patients. This evidence indicates that proper assurances were made.
 
 IV. ALLEGED FEDERAL VIOLATIONS
 
 53
 The plaintiffs ask that the reimbursement plan be enjoined until such time as the Secretary of Health and Human Services provides through regulation specific criteria defining what is meant by the terms "efficiently and economically operated facilities" and "hospitals which serve a disproportionate number of low income patients with special needs" found in 42 U.S.C. Sec. 1396a(a)(13)(A). They would also require the Secretary to establish criteria by which to judge the reasonableness of the classes used in reimbursement plans.
 
 
 54
 This argument is built around our decision in Alabama Nursing Home, where we held that the Department of HEW, then in charge of Medicaid oversight, had "failed to define 'efficiently and economically operated' facility," a term used in the Medicaid regulation then in force, and had "neglected to formulate criteria by which to judge the reasonableness of the classes utilized in a proposed reimbursement methodology." 617 F.2d at 394. The decision found a need for HEW to develop specific criteria and standards regarding these matters.
 
 
 55
 The Alabama Nursing Home case is distinguishable because different statutory requirements now govern federal oversight of state reimbursement plans. The relevant statute in that case required that a state reimbursement plan for nursing homes must provide for payment "on a reasonable cost related basis," and that the cost-finding methods used by the state must be "approved and verified by the Secretary." 42 U.S.C. Sec. 1396a(a)(13)(E) (amended 1980, repealed 1981) (emphasis added). These standards have been relaxed by subsequent legislation. Section 2173 of the Omnibus Budget Reconciliation Act of 1981, 42 U.S.C. Sec. 1396a(a)(13)(A), now requires only that the state make "assurances satisfactory to the Secretary" in contrast to the previous language interpreted in Alabama Nursing Home that the Secretary approve and verify the methodology used by the states in reimbursing nursing homes.
 
 
 56
 As explained above, the current statute seeks to reduce federal oversight of state reimbursement plans. "Congress intended that states set their own reimbursement rates without stifling and expensive federal oversight of the methodology used, as had been the case under the former reasonable cost related standard .... Probing beyond the bottom line to the underlying rate setting methodology is not required under the new standard." Coalition of Michigan Nursing Homes, Inc. v. Dempsey, 537 F.Supp. 451, 459 (E.D.Mich.1982). Furthermore, even at the time of Alabama Nursing Home, while the Secretary was required to approve and verify nursing home reimbursement plans, reimbursement plans for hospitals needed only to be "reviewed and approved" by the Secretary. 42 U.S.C. Sec. 1396a(a)(13)(D) (repealed 1981). Thus, the standard construed in Alabama Nursing Home has never applied to hospital inpatient reimbursement plans.
 
 
 57
 Under current federal regulations, state Medicaid agencies are required to make assurances to the Secretary that: (1) the requirement in 42 C.F.R. Sec. 447.252(a)(1) that the state agency must use "rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards" is met; (2) the requirement in 42 C.F.R. Sec. 447.252(a)(3)(iii) that rates "must be adequate to assure that recipients have reasonable access, taking into account geographic location and reasonable travel time, to inpatient hospital services of adequate quality" is met; (3) the state agency has itself made findings as to: the adequacy of rates mandated in 42 C.F.R. Sec. 447.252(a)(1), due consideration for hospitals serving a disproportionate number of low income patients mandated in Sec. 447.252(a)(3)(i), lower rates for hospitals providing an inappropriate level of care mandated in 42 C.F.R. Sec. 447.252(a)(3)(ii), and adequacy of rates to assure recipients access to inpatient services of adequate quality mandated in 42 C.F.R. Sec. 447.252(a)(3)(iii); (4) they provide for uniform cost reporting and periodic audits as required by 42 C.F.R. Sec. 447.252(f); (5) they have complied with the notice requirements in 42 C.F.R. Sec. 447.254; (6) include information on the amount of the average proposed rate for each type of provider and the amount by which that average rate has increased or decreased from the preceding rate period; (7) estimate the short-term and, to the extent possible, long-term effect the change in the rate will have on the availability of services on a statewide and geographic area basis, the type of care furnished, the extent of provider participation, and the degree to which costs are covered in hospitals that serve a disproportionate number of low income patients with special needs. 42 C.F.R. Secs. 447.252(c), 447.255. While these requirements cannot be described as extremely onerous, we are satisfied that they are sufficient to place the Secretary in the role envisioned by the current statute.
 
 
 58
 V. THE AMENDMENT DISALLOWING RECOVERY OF MEDICAID LITIGATION COSTS
 
 
 59
 In October of 1981 the state amended its reimbursement plan to disallow reimbursements for legal costs and fees incurred in suits against federal and state agencies administering the Medicaid program. The district court invalidated the amendment on grounds that procedures regarding federal approval, public notice and comment, and consultation with the MCAC had not been followed, and no rational reason for the change had been given. The state filed a cross-appeal defending the amendment. We agree with the state and reverse the district court on this issue.
 
 
 60
 The plaintiffs' amended complaint, signed on November 20, 1981, claimed that the plan amendment had not received federal approval. This argument has not since been made by the plaintiffs and they do not assert it on appeal. Both state and federal defendants answered the complaint by stating that the amendment had been approved, the director of the Mississippi Medicaid Commission answered an interrogatory by stating that federal approval had been given orally on November 17, 1981, and the record contains as well a written approval by the Department of Health and Human Services of the entire current plan given on December 21, 1981. The trial court erred in finding a lack of federal approval; there is no question but that such approval was given.
 
 
 61
 The state admits that the amendment was not the subject of public notice under 42 C.F.R. Sec. 447.254, and argues that the regulation is inapplicable because it only requires notice of "any significant proposed change in its methods and standards for setting payment rates ...." (emphasis added). The state has consistently maintained that the amendment affects costs that represent less than one-half of one percent of total reimbursement to hospitals, and the plaintiffs do not dispute this figure.
 
 
 62
 The current regulation was promulgated on September 30, 1981. For inpatient hospital services it replaced 42 C.F.R. Sec. 447.205, a notice provision that required state agencies to give public notice at least sixty days before the effective date of reimbursement changes for a Medicaid service that were expected to affect a state's Medicaid expenditures for that service by one percent or more during the twelve months following the effective date. In a notice of proposed rulemaking, the Department of Health and Human Services stated that this earlier regulation was "intended to help restrain the rapid increase in health care costs," and that instead it had "impeded health care cost containment measures" by delaying reductions in reimbursement levels. 46 Fed.Reg. 45,964-65 (1981). In promulgating the current regulation, which abolished the sixty day notice and one percent expenditure threshold requirements, the Department stated:
 
 
 63
 [W]e have included a procedural requirement that the State continue to issue public notice of any major change in its method of calculating payment rates for inpatient hospital or LTC services. However, in the interest of limiting the State's flexibility as little as possible and to streamline the process, we are not establishing either an explicit expenditure threshold that would have to be exceeded before public notice is required, or a mandatory length for the comment period.
 
 
 64
 46 Fed.Reg. 47,967 (1981).
 
 
 65
 Since the amendment would not have required public notice under the former regulation, and since the present regulation was adopted to reduce the administrative burdens placed on state Medicaid agencies and to give them greater flexibility in changing their reimbursement schemes, we do not read the current regulation to require public notice.
 
 
 66
 The state's admitted failure to consult the MCAC proceeds along a similar analysis. The MCAC is not a ratemaking body that must approve every change in reimbursement methodology. Indeed, as explained above, the MCAC is not an administrative agency that approves anything; its role is advisory only. One government manual describes the role of the MCAC as follows:
 
 
 67
 Advisory Committees provide advice not easily obtainable elsewhere; they have an important potential for improving public relations; and they provide external support for agency policy and programs. In addition, Advisory Committee functions should include exploring designated problem areas, making specific recommendations, and resolving conflicts with persons or groups outside the agency; contributing to the formulation of agency policy and standards; and evaluating the agency's program from the viewpoints of professional groups and of the community.
 
 
 68
 Department of Health, Education, and Welfare, Medicaid Assistance Manual, Guideline 2-30-00: Role of a State Medical Care Advisory Committee 6 (1971). The Manual goes on to state that the MCAC "may appropriately consider a wide range of topics" including "[f]ee schedules for physicians, nursing homes, etc." Id. at 8 (emphasis added).
 
 
 69
 It would be an understatement to say that the role of the MCAC is not explicitly spelled out in any federal statute, regulation or manual. One advocate of such committees has concluded that "[i]t is clear from the guidelines that HEW envisions that no significant program or policy change will be made by a state until its MCAC is consulted." Rosenbaum, Administration of a State Medicaid Program: The Role of the Medical Care Advisory Committee, 11 Clearinghouse Rev. 918, 920 n. 13 (1978) (emphasis added). Conceivably the complete absence of an MCAC or one that is improperly constituted or exists in name only, or the failure to consult the committee on a fundamental policy change in a reimbursement plan, might contravene the vague requirement in 42 C.F.R. Sec. 431.12(e) that "[t]he committee must have opportunity for participation in policy development and program administration, including furthering the participation of recipient members in the agency program." Such conditions are not present here. Where the latest rounds of statutory and regulatory changes have emphasized increased state autonomy over Medicaid, and where the federal agency whose own regulation is in question has approved the state's actions, we are reluctant to read more into a regulatory requirement than is clearly expressed.
 
 
 70
 Finding no procedural violations, we turn finally to the question of whether the amendment has a rational basis. The potential for financial havoc in the health care industry is great because of the unique characteristics by which costs are incurred. One party, the doctor or hospital, orders services for a second party, the patient, to be paid for by yet a third party, the government. As a result, there is a lack of cost consciousness even more profound than that found in an ordinary government bureaucracy. This already mischievous system is not helped by a reimbursement scheme that allows a hospital to recover its litigation costs--win or lose--from the government opponent it is suing. Without deciding the wisdom or ultimate impact of the amendment, we are satisfied that it has a rational basis that no one, except perhaps a lawyer, would have trouble in comprehending.
 
 VI. CONCLUSION
 
 71
 To summarize, a state of limited resources, in the face of federal cutbacks, has adopted a plan to make the most of its Medicaid funds. The plan complies with flexible federal substantive and procedural requirements and cannot be described as arbitrary or capricious.
 
 
 72
 The judgment of the district court is reversed insofar as it invalidated the plan amendment removing Medicaid litigation costs from the array of reimbursable expenses. The remainder of the judgment is affirmed.
 
 
 73
 AFFIRMED IN PART, REVERSED IN PART.