COLORADO HEALTH CARE ASSOCIATION; Geriatrics, Inc.; Miller Nursing Home, Inc., d/b/a Fairview Care Center; Springs Village, Inc., d/b/a Springs Village Recovery Center; W II, Inc., d/b/a St. Paul Health Center; W III, Inc., d/b/a Glen Ayr Health Center; North Shore Manor, Inc.; and Evergreen Care Center, Ltd., Plaintiffs,

v.

COLORADO DEPARTMENT OF SOCIAL SERVICES; George S. Goldstein, in his official capacity as Acting Executive Director of the Department of Social Services; Colorado State Board of Social Services; Gilbert Slade; Nona Thayer; Felix S. Cordova; Thomas C. Hickman; Mark E. Notestine; Larry Velasquez; Sharon G. Hill; James E. Martin; and Florangel Mendez, in their official capacities as members of the Colorado Board of Social Services; and the State of Colorado, Defendants.

Civ. A. No. 83–K–345.

United States District Court,
D. Colorado.

Dec. 5, 1984.

**1402**

Frederick Miles and Barry D. Epstein, Miles & McManus, Denver, Colo., for plaintiffs.

Wade Livingston, Asst. Atty. Gen., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

This action challenges the defendant Colorado State Board of Social Services policy of reducing certain medicaid payments to nursing home operators in an attempt to alleviate budget shortfalls.

Individual plaintiffs are duly authorized business entities in Colorado who own, lease, operate or manage long-term care facilities and are certified, participating providers of long-term nursing care and other services under the Colorado Medical Assistance Program. Plaintiff Colorado Health Care Association is a not-for-profit corporation and is comprised of members who are long-term care nursing providers.[1]

Defendant Colorado Department of Social Services is responsible for the administration and supervision of the Colorado medicaid program. It implements the rules of defendant Colorado State Board of Social Services governing the medicaid program's scope and content, requirements, obligations and rights of providers who are certified for participation in the program. Colo.Rev.Stat. §§ 26–1–111 and 26–4–101 to 116 (1982 Repl.Vol.).

### A. Procedural History

Plaintiffs instituted this action in the District Court in and for the City and County of Denver, State of Colorado (Case No. 83–CV–1172) on February 7, 1983. They challenged adoption by the board of an amendment to its medicaid program regulations which eliminated payment of a statutorily established "incentive allowance" as part of the reimbursement for certified medicaid providers of long-term care nursing services. The complaint included claims for judicial review under Colorado's Administrative Procedure Act, Colo.Rev. Stat. §§ 24–4–101 to 108 (1982 Replacement Volume), injunctive and declaratory relief and damages. Simultaneously, plaintiffs moved for a stay or postponement of the effective date of the agency action under Colo.Rev.Stat. §§ 24–4–106(5) and (8) (1973), and for a temporary restraining order under Colo.R.Civ.P. 65. The complaint asserts six separate claims for relief as follows: the first claim asserts violations of separation of powers under the Colorado constitution; the second claim alleges violations of the Colorado Administrative Procedures Act; the third claim alleges violations of the federal Social Security Act; the fourth and fifth claims assert substantive deprivation of rights, privileges and immunities including equal protection; and, final-

---

1. Standing, in actions such as this, has generally been recognized for both the individual facilities and the health care associations. *See Alabama Nursing Home Ass'n v. Califano,* 433 F.Supp. 1325, 1328 (D.Ala.1977); *Massachusetts Hosp. Ass'n, Inc. v. Harris,* 500 F.Supp. 1270, 1275–76 (D.Mass.1980).

ly, the sixth claim alleges a common law breach of contract.

On March 2, 1983, defendants, in a *volte-face* to their position against federal court intrusion, filed a petition for removal of the action to this court under the provisions of 42 U.S.C. § 1441, alleging that the matter primarily involved a federal question requiring the construction of the Medicaid Program under Title XIX of the Social Security Act. Defendants also filed their answer to the complaint, generally denying plaintiffs' allegations. Jurisdiction over the third, fourth and fifth claims is based upon resolution of questions of federal law. *See Friendship Villa—Clinton, Inc. v. Buck*, 512 F.Supp. 720, 722–25 (D.Md.1981). I retain pendent jurisdiction over the remaining state law claims in the interests of judicial economy.

Plaintiffs' motion for a stay or postponement of the effective date of the agency action was scheduled for a hearing on March 9, 1983. At that time, however, the parties appeared and agreed that the hearing should be indefinitely continued based upon a settlement, at least in part, of the issues in this case. Thereafter, by stipulation dated May 18, 1983, defendants agreed to reinstate the incentive payments to qualified providers on a retroactive basis from and after February 4, 1983 and that such payments were to be brought current by no later than May 25, 1983. The stipulation further provided that upon defendants' failure to pay the incentive factor to the extent of available funds, either party could request the court to schedule a hearing in connection with the determination of whether the incentive factor would be paid further. This stipulation was approved and reduced to an order on May 19, 1983.

On or about June 28, 1983, plaintiffs filed a Motion for Order to Show Cause, alleging that defendants had violated the stipulation of the parties and order of the court by failing to pay the incentive allowance for approximately one and one-half months in April through June of 1983. On July 1, 1983 I entered an order, setting July 18, 1983 for a hearing requiring defendants to show cause why they should not be ordered to continue to pay the incentive allowance for the full period from February 4, 1983 through June 30, 1983. This order was later amended on July 12, 1983 to correct a typographical error.

The show cause hearing was held on July 18th and 19th, at which time the parties appeared and submitted briefs, stipulations of fact and evidence, testimony of witnesses and exhibits. At the conclusion of the hearing I requested the parties to consider consolidation of the hearing under the provisions of Fed.R.Civ.P. 65(a)(2). Accordingly, on July 27, 1983, the parties filed a stipulation requesting that I consider the record made in the course of the pleadings, stipulations and the show cause hearing as being dispositive of a trial on the merits.

After further stipulation of the parties, the complaint was supplemented on June 7, 1984 seeking additional relief because of the suspension of the incentive allowance again in June 1984. The issues raised in the supplemental complaint and the original complaint are identical.

The parties submitted extensive briefs before and after the evidentiary hearing. All relevant facts and legal issues have been presented and the case is ripe for final determination.

### B. The Colorado Medicaid Program

Colorado participates in the federal matching fund program, established under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 to 1396p. It provides for medical assistance to needy individuals and is popularly known as "medicaid." Colorado Medical Assistance Act, Colo.Rev.Stat. §§ 26–4–101 to 108 (1973). This case involves only the portion of the Colorado medicaid program under which eligible recipients receive nursing home care.

In Colorado, when a nursing home provides care for a medicaid eligible recipient, the Colorado Department of Social Services pays the nursing home for that care on the basis of a per diem rate. The department establishes a rate for each individual nurs-

ing home. In general this rate is adjusted for each nursing home at least twice a year. These rates are prospective and based on costs. This means a nursing home is paid on a rate based upon costs reported earlier. For example, a nursing home providing services in August of 1983 may be paid a rate based upon costs reported for a period ending in May of 1983, or earlier.

Although the rate is based generally on costs there are some restrictions and adjustments before it can be finally calculated. Under Colorado law, nursing home costs are divided into two categories: administrative costs and health care costs. Colo.Rev.Stat. § 26-4-110 (1973). Health care costs are not subject to a maximum reimbursement formula or "ceiling." They are not involved in the calculation of the incentive allowance. Administrative costs, on the other hand, are subject to a maximum reimbursement formula or "ceiling," which is defined in the regulations as "[t]he actual cost of administration, property, and room and board costs (excluding raw food) to the ninetieth percentile (90%-ile) of all medicaid patients residing in each class of nursing homes." 10 C.C.R. §§ 2505-10 and 8.441.3(c)(2). Nursing homes with administrative costs below the ninetieth percentile of all nursing homes in their class receive a rate based upon their total reported administrative costs. Nursing homes with administrative costs above ninetieth percentile will receive a rate based on something less than their total reported administrative costs. This ninetieth percentile maximum reimbursement level is often referred to as a "ceiling" or "cap."

If a nursing home's administrative costs are below the ceiling, the department will increase the nursing home's rate by an incentive allowance. Colo.Rev.Stat. § 26-4-110(5)(c) (1973); 10 C.C.R. § 2505-10 and 8.441.2(E).[2] The incentive factor is calculated as one-half of the difference between the ceiling and a provider's actual administrative costs. If a nursing home keeps its costs, and thus its rates, below the ceiling, the nursing home and the department split the amount saved. The formula provides nursing homes with an incentive to contain their costs, hence the name "incentive allowance."

The department makes one other adjustment to costs before setting rates. Colo. Rev.Stat. § 26-4-110(5)(b) (1973); 10 C.C.R. § 2505-10, 8.441.2(D). The costs are increased based upon the consumer price index to compensate for changes in costs occurring during the period of time between the date costs are reported and the date the rate actually goes into effect. This adjustment is known as the fluctuating cost factor.

At its regularly scheduled meeting on February 4, 1982, the board adopted, on an "emergency basis," an amendment to the regulations eliminating payment by the department of the incentive factor from and after February 4, 1982 due to a perceived emergency arising out of a budget shortfall. Defendants have stipulated that the incentive allowance was terminated solely because of a lack of available appropriations.

The evidence presented by plaintiffs demonstrates the finding of a funding shortage was foreseeable in advance of the termination of incentive allowance payment. The board had long been aware of potential budget difficulties and considered

---

**2.** In accordance with the mandate requiring defendants to adopt rules to "determine and pay" the incentive under the Colorado Medical Assistance Act, the department regulation existing before February 4, 1982 provided:

> If the nursing home's combined audited administration, property and room and board (excluding raw food) cost per patient day is less than the maximum reasonable cost for administration, property and room and board (excluding raw food) costs for the class, the

> provider will earn an incentive allowance. The incentive allowance shall be calculated as one-half the difference between the facility's audited cost and the maximum reasonable cost [the statutorily prescribed 'ceiling'], not to exceed twelve percent (12%) of the maximum reasonable cost. No incentive allowance will be paid on health care services or raw food costs.

Department of Social Services Regulation 8.441.2E.

terminating the incentive allowance, to cut costs, well before the February 4, 1982 meeting. The testimony of Cecilia Holmes and Richard Allen indicated that funding problems were a regular occurrence faced by the Department of Social Services and cost-cutting proposals had been considered for some time. This does not mean, however, that the fiscal 1982–83 shortfalls were not more acute than in previous years. The evidence indicates that both the governor and the legislature were putting increasing pressure on state agencies to reduce their costs. State revenues were less than projected and a previously existing surplus revenue was depleted. Thus, chronic funding problems in prior years degenerated into what was perceived, at least from a political point of view, as a budgetary emergency.

### C. The Federal Medicaid Program

Medicaid is a federal matching grant program for medical assistance to indigent and other individuals whose income and resources fall below certain prescribed levels. Federal requirements for the program are set forth under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 to 1396p. Medicaid provides this assistance to eligible recipients in the form of direct reimbursement to providers of long-term nursing care.

Effective October 1, 1980, Title XIX was amended to provide:

A state plan for medical assistance must ... provide ... for payment of the skilled nursing facility services provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State ...) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations and quality and safety standards and to assure that individuals eligible for medical assistance

have reasonable access ... to inpatient hospital services of adequate quality; and such State makes further assurances, satisfactory to the Secretary, for the filing of uniform cost reports by each skilled nursing or intermediate care facility and periodic audits by the State of such report.

42 U.S.C. § 1396a(a)(13)(A); P.L. 96–499, § 962(a) (1980). This provision, commonly referred to as "the Boren Amendment" is the foundation upon which the state medicaid plan must implement methods and procedures for payment of services to program beneficiaries by certified providers under Title XIX. 42 U.S.C. § 1396a(a)(30).

■ A state is not required to participate in the medicaid program. If it elects to do so, however, the state and its medicaid agency must comply with all federal statutes and regulations governing the program and reimbursement to participating providers. *See Harris v. McRae*, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). States that wish to participate in medicaid must submit a state plan to be approved by the Department of Health and Human Services (HHS). 42 U.S.C. § 1396a(b). Federal law and regulations specify a number of requirements which the state plan must meet before it can be approved. One of these is the Boren Amendment requirement that nursing home rates be "... reasonable and adequate to meet costs which must be incurred by efficiently and economically operated facilities...." 42 U.S.C. § 1396a(a)(13); 42 C.F.R. § 447.252(a). In addition, the regulations also require that a provider accept a state's payment under the plan as payment in full for its service and that the plan's payments be "sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population." 42 C.F.R. § 447.-204. *See also* 42 C.F.R.

Whenever a state changes its method of determining nursing home rates, it must give notice to HHS in the form of a proposed amendment to the state plan. 42

C.F.R. 447.201(b) and 45 C.F.R. 201.3(a). Federal approval of such amendments is a condition of continued matching funds. 45 C.F.R. 201.3(f) and 201.6(a). As required, Colorado submitted its proposed amendments to suspend the payment of incentive allowances for services rendered from April 1, 1983 to May 30, 1983, from June 7, 1983 to June 30, 1983 and from June 1, 1984 to June 30, 1984. Each of these changes was approved by HHS.

## II

### A. Eleventh Amendment

■ The Eleventh Amendment to the United States Constitution provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." States and their agencies may not be sued in federal court directly or indirectly for damages or for injunctive or declaratory relief by virtue of the Eleventh Amendment. Also, such suits may not be maintained by citizens of the defendant state. *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). *See also Verner v. State of Colorado*, 533 F.Supp. 1109, 1112–14 (D.Colo.1982), *aff'd*, 716 F.2d 1352 (10th Cir.1983).

■ To the extent plaintiff's prayer for injunctive relief seeks prospective payment of the incentive factor, the Eleventh Amendment does not bar relief. Claims seeking retroactive reimbursement of the incentive allowances are, however, barred. *See Florida Dept. of Health and Rehabilitative Services v. Florida Nursing Home Ass'n*, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981). Moreover, Eleventh Amendment protections also preclude my consideration of pendent state law claims to the extent they seek damage remedies. *See Pennhurst State School & Hosp. v. Halderman*, —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

■ Defendants, however, have waived their Eleventh Amendment immunity as to all issues in this lawsuit. The prevailing standard precludes the inference of a waiver of sovereign immunity absent clear and unequivocal consent. *See Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974). Here, the State's actions indicate its intent to waive Eleventh Amendment protections. *See Gallagher v. Continental Ins. Co.*, 502 F.2d 827, 830 (10th Cir.1974). First, defendants, not plaintiffs, invoked the jurisdiction of this court by removing the action from state court. Second, waiver can be found in the express stipulation entered by the parties in which defendants agreed to pay the incentive allowance on a retroactive basis. Finally, defendants have impliedly waived Eleventh Amendment protections by failing to assert the defense in the face of plaintiffs' explicit arguments that immunity had been waived.

### B. Violations of Federal Law

Plaintiffs contend that states may not, consistent with federal law, structure their medicaid programs based upon budgetary considerations. *See, e.g., Alabama Nursing Home Ass'n v. Harris*, 617 F.2d 388, 396 (5th Cir.1980); *Illinois Hosp. Ass'n v. Illinois Dept. of Public Aid*, 576 F.Supp. 360, 368 (N.D.Ill.1983).

■ Defendants argue that the principles of exhaustion of administrative remedies and primary jurisdiction militate against my considering the federal issues at this time. The state suggests that I defer to the judgment of HHS. As defendants acknowledge, however, there exists no federal or state administrative forum to which plaintiffs can turn for consideration of their claims. Thus, deference to the determination of a federal agency does not compel me to decline to hear plaintiffs claims. *See Yanez v. Jones*, 361 F.Supp. 701, 705–6 (D.Utah 1973).

Nevertheless, HHS has had an opportunity to consider the defendants' suspension of incentive allowance payments and the agency's determination is due considerable

deference in my evaluation of the appropriateness of the state action. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 796, 13 L.Ed.2d 616 (1965); *Mayoral v. Jeffco Amer. Baptist Residences, Inc.,* 726 F.2d 1361, 1363 (10th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984). The agency approved the termination of the incentive allowance as consistent with the requirements of the Social Security Act. I concur in this evaluation.

 Plaintiffs' position oversimplifies the requirements of 42 U.S.C. § 1396a(a)(13)(A). Clearly, budgetary considerations can enter into a state's evaluation and development of a funding plan. *See Mississippi Hosp. Ass'n, Inc. v. Heckler,* 701 F.2d 511, 518 (5th Cir.1983). States are afforded wide latitude in formulating specific medicaid plans. *See In re Madeline Marie Nursing Homes,* 694 F.2d 433, 492 (6th Cir.1982). Nevertheless, states which participate in medicaid must comply with the requirements of federal law. *Harris v. McRae,* 448 U.S. at 301, 100 S.Ct. at 2680. Federal law requires that "the lack of federal funds from local sources will not result in lowering the amount, duration, scope of quality of care and services available...." 42 U.S.C. § 1396a(a)(2). Plaintiffs have not shown, nor have they attempted to argue, that the termination of the incentive allowance has adversely affected the quality of patient care. Since Colorado continues to compensate for actual costs, I find that the suspension of the incentive allowance does not run afoul of the requirements of the Social Security Act.

The base rate payment which compensates nursing homes for actual costs at the 90th percentile level insures adequate care. In other states, even lower levels of base compensation have been held adequate under federal law. *See Mississippi Hosp. Ass'n Inc.,* 701 F.2d at 517–18. While the incentive factor may, from a policy point of view, provide the proper incentives to encourage efficiently operated facilities, the minimum standards set by the Social Security Act do not require the payment of such "add ons." The State of Colorado is free, under the requirements of the Social Security Act, to pay or not pay an incentive factor as it deems fit. It is not the province of federal courts to delve into the nuance of state programs when Congress has specifically delegated the operation of those programs to the states.

 Plaintiffs also argue that termination of the incentive allowance was arbitrary and capricious so as to deny them substantive due process and equal protection. In support, plaintiffs argue that legislative budgetary allocations were sufficient to permit further payment. Thus, the incentive allowance was singled out as the item of reduction contrary to state law requirement that nursing homes receive payment of the incentive allowance subject to appropriations by the General Assembly. Colo.Rev.Stat. § 26–4–110(5) (1978). This argument encompasses the first, fourth and fifth claims for relief asserted in the complaint. At root, plaintiffs appear to contend the board's actions violated state law by encroaching on the authority of the state legislature and the termination of the incentive allowance was an arbitrary classification. As to the first issue, plaintiffs do not have standing to assert claims involving disputes between the state executive and legislature. Moreover, I find the department's interpretation of state law, so as to recognize a limitation on appropriations, to be reasonable and supported by competent evidence. *See Noe v. Dolan,* 197 Colo. 32, 34, 589 P.2d 483 (1979).

 As to the second claim plaintiffs have not met their burden of proof to show a violation of the Fourteenth Amendment. The burden is on the plaintiffs to show that defendants' actions violated the Fourteenth Amendment, *Mississippi Hosp. Ass'n, Inc.,* 701 F.2d at 517. All the defendants need show is that some set of facts justified their actions terminating the incentive allowance. *See McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1104–05, 6 L.Ed.2d 393 (1961); *California Ass'n of Bioanalysts v. Rank,* 577 F.Supp. 1342, 1352–58 (C.D.Cal.1983). The

evidence indicates that the budgetary concerns of the board were real and that the board carefully considered several alternatives to meet the shortfall. The cost cutting alternatives were also presented to the joint budget committee of the legislature for consideration. The termination of the incentive allowance was neither arbitrary nor capricious in violation of Fourteenth Amendment protections.

### C. State Law Claims

 Plaintiffs suggest that the rules suspending the incentive allowances were invalid because they were not supported by any bona fide emergency. Thus, plaintiffs allege that defendants' actions violated the Colorado Administrative Procedure Act, Colo.Rev.Stat. § 24–4–103 (1982 Replacement Volume). If such procedural flaws occurred, they were only of a technical nature and do not compel striking down the agency action. *See Georgia Hosp. Ass'n v. Dept. of Medical Assistance*, 528 F.Supp. 1348, 1358–59 (D.N.D.Ga.1982).

Like the federal Administrative Procedures Act, which plaintiffs suggest is analogous, the Colorado act outlines procedures for rulemaking. The Colorado APA requires notice of proposed rulemaking to be published at least 20 days before the public rulemaking proceedings commence. Colo. Rev.Stat. § 24–4–103(3). The APA also requires the agency to give interested parties an opportunity to be heard before adopting the rule. Colo.Rev.Stat. § 24–4–103(4). Finally, the APA provides that a rule will be effective 20 days after it has been published. Colo.Rev.Stat. § 24–4–103(5). The procedures can be suspended for temporary emergency rulemaking. Colo.Rev. Stat. § 24–4–103(6).

Notice of the proposed suspension of the incentive allowance was given as early as January 7, 1983, when the proposed rule came before the board for initial review. Various representatives of the nursing home industry appeared at the January meeting and were heard in opposition to the proposal. Again in February, when the board considered the proposed rule for adoption, several representatives from the nursing home industry offered statements in opposition to the suspension of the incentive allowance. The only practical consequence of the board's finding that the rule should be adopted on an emergency basis was the rule became effective upon adoption, rather than twenty days after publication. Thus, even if there was no bona fide emergency, as plaintiffs contend, the procedure used did not deny plaintiffs the notice or the opportunity to be heard which they would have enjoyed if the rule had been adopted without a finding of an emergency. In short, plaintiff's challenge to the rule on this point is merely technical and procedural, involving no substantive rights.

 Plaintiffs suggest that no bona fide emergency existed at the time the board adopted the rule temporarily suspending the incentive allowance because the department regularly overspent its budget and knew that it was underappropriated from the very beginning of the fiscal year. The board, however, did not know whether a supplemental appropriation would be available. It had to evaluate the various cost-saving initiatives that were available within the limits of state and federal law. Plaintiffs' argument assumes public officials should have no fiscal responsibility and that available cost saving options should not be pursued. That proposition is, to say the least, dubious. In any event, the argument rests on an incorrect understanding of the facts. Plaintiffs apparently believe the department can continually overspend its appropriations for the medicaid program without endangering the availability of medicaid services. As explained at the hearing by Mr. Armstrong and Ms. Holmes, the department had technically overspent certain line items in its budget or violated "M" provisions in the past. It may have suffered fiscal sanctions from the General Assembly as a result. Until fiscal year 1982–1983, however, the department, as a whole, had never exceeded its budget. When that occurred at the end of fiscal year 1982–1983, the department was unable to pay for medicaid ser-

vices that had been rendered. The budgetary problems that developed during the course of fiscal year 1982–1983, thus justified the adoption of the emergency rule. If the department had not mitigated the shortfall, it is not at all unlikely that its inability to pay the bills would have jeopardized the availability of medicaid services. The department's actions in adopting emergency measures were neither arbitrary nor capricious, nor did these actions constitute an abuse of discretion.

■ Plaintiffs also attack the rule because it is not supported by any "study" or "findings." Rules, such as the ones at issue, based primarily on policy considerations, do not require specific factual support. It is enough if the reasoning process that leads to the rule's adoption is defensible. *Citizens for Free Enterprise v. Department of Revenue*, 649 P.2d 1054, 1064 (Colo.1982). The rule does not need to be supported by specific, objective data.

Each long-term care facility's participation in the medicaid program is embodied in a provider agreement. By its terms, this agreement describes the contractual relationship of the parties as that of the provider being an independent contractor for the state, agreeing to perform and render long-term care services in accordance with Title XIX of the Social Security Act and other relevant federal and state law. In exchange, the state covenants to reimburse the facility for services rendered in accordance with these same laws. The reimbursement methodology is established by the Department of Social Services pursuant to the Colorado Medical Assistance Act and the regulations promulgated thereunder.

Plaintiffs claim that they are entitled to the incentive allowance under the terms of their contracts. The contracts provide in relevant part:

The Contractor agrees to perform its duties and obligations hereunder *in conformance with ... all pertinent regulations* of the Colorado Department of Social Services ... in effect as of the date of execution of this contract, or *as they may be later amended.*

... *Contractor shall be reimbursed by the Department in such amounts as may from time to time be set* by the Colorado Department of Social Services *pursuant to* the Medicaid statute, the Colorado Medical Assistance Act, and *the rules and regulations* promulgated thereunder.

... *Payment* pursuant to the Contract will be made as earned, in whole or in part *from available State funds for the purchase of nursing care services.* It is agreed that the maximum amount of State funds available for the fiscal year is the amount appropriated. (Emphasis added.)

The contracts contain no guarantee that the incentive allowance will be paid. In fact, the contracts do not even mention the incentive allowance. The contracts bind the plaintiffs to accept as payment in full the amounts set by the department in accordance with its rules.

■ Since the incentive allowance was suspended by valid departmental rule, there has been no breach of the contracts. In addition, plaintiffs have no claim for failure of compensation earned. The incentive allowance is not earned by providing services, rather it was paid as a condition of avoiding costs. The plaintiffs have been compensated for all costs earned in providing nursing care. Where, as here, agreements provide for no specified rates and the nursing homes are on notice that rates will fluctuate according to appropriations, the termination of the payment of incentive allowances was within the administrative and contractual discretion of the Department of Social Services. *See La Crescent Constant Care Center, Inc. v. State Dept. of Public Welfare*, 301 Minn. 229, 222 N.W.2d 87 (1974).

Accordingly, I find for the defendants. Defendants actions neither violated federal nor state law. Plaintiffs' claims for relief are denied.

IT IS ORDERED that this complaint and civil action are dismissed.