659 F.Supp. 1309 (1987)
MAINE ASSOCIATION OF INTERDEPENDENT NEIGHBORHOODS, Glennis Cook and Minnie Carr, Plaintiffs,
v.
Michael PETIT, Commissioner, Maine Department of Human Services and Otis R. Bowen, Secretary, United States Department of Health and Human Services, Defendants.
Nancy HAGGAN, Plaintiff,
v.
Michael PETIT, Commissioner, Maine Department of Human Services, Defendant,
v.
Otis R. BOWEN, Secretary, United States Department of Health and Human Services, Third-Party Defendant.
Civ. Nos. 83-0360-B, 85-0174-B.
United States District Court, D. Maine.
April 28, 1987.
*1310 *1311 Linda Christ, Pine Tree Legal Assistance, Augusta, Me., Peter Darvin, Pine Tree Legal Assistance, Portland, Me., for plaintiff and petitioner.
Marina E. Thibeau, Carmen L. Coulombe, Dept. of Human Service, Legal Div., Augusta, Me., Lawrence E. Burstein, Asst. Reg. Atty., Dept. of Health and Human Services, Boston, Mass., David R. Collins, Asst. U.S. Atty., Portland, Me., for defendant and respondent.

MEMORANDUM OF DECISION AND ORDER ON THIRD-PARTY DEFENDANT'S MOTION TO DISMISS AND ON THE MERITS
GENE CARTER, District Judge.
These cases are before the Court on Third-Party Defendant Secretary's motion to dismiss and, should that motion be denied, for decision on the merits based on a stipulated record. Both the main and third-party controversies revolve around the validity of the so-called "6,000/6%" rule used *1312 by Defendants to calculate eligibility for Medicaid. For the reasons stated herein, the Court will deny the Secretary's motion to dismiss, will issue a permanent injunction restraining Defendants from enforcing in the Medicaid context the $6,000/6% rule as currently adopted, and will further order Defendant Commissioner to redetermine Plaintiff Haggan's Medicaid eligibility from December 1984 forward without regard to the $6,000/6% rule. Finally, the Court will grant Defendant Commissioner's request for declaratory relief against Defendant Secretary.

I. LEGAL AND FACTUAL BACKGROUND
At issue are related but not identical rules used by Defendant Bowen, Secretary of the United States Department of Health and Human Services (HHS) to calculate Supplemental Security Income (SSI) eligibility, and Defendant Petit, Commissioner of the Maine Department of Human Services (DHS), to calculate eligibility for Medicaid benefits. The rules relate to a category of Medicaid eligibility known as "SSI-related medically needy," composed of individuals whose incomes exceed the protected income level as defined by the federal SSI program but who meet the non-financial requirements of that program (i.e., are aged, blind, or disabled) and who have incurred medical expenses at least equal to the difference between their income and the protected income level. See 42 U.S.C. §§ 1396a(a)(10)(C)(i)(III), 1396a(a)(17) (1982) (requiring state Medicaid eligibility standards and methodologies to conform to those of federal SSI program). Therefore, although the Medicaid program is directly administered by the states, the standards for eligibility for federal SSI payments help determine Medicaid eligibility.
One such federal SSI eligibility standard states that "[i]n determining the resources of an individual (and his eligible spouse, if any) there shall be excluded ... property which, as determined in accordance with and subject to limitations prescribed by the Secretary, is so essential to the means of self-support of such individual (and such spouse) as to warrant its exclusion...." 42 U.S.C. § 1382b(a)(3) (1982). Since January of 1974, the Secretary in his Program Operation Manual System (POMS) has defined both business and nonbusiness property as "essential to the means of self-support" only where the claimant's (or spouse's) equity in the property is $6,000 or less and the annual net income from the property is at least 6% of the equity value. (Currently the 6% criterion does not apply to a claimant's home.) Until 1983, however, the Commissioner of Maine's DHS, in calculating SSI-related medically needy eligibility, excluded all property essential to a claimant's means of self-support, without regard to the $6,000/6% rule just described. In April of 1983 the Commissioner adopted a version of the $6,000/6% rule.[1] However, in June of 1983, the Secretary's Health Care Financing Administration directed the Commissioner to utilize a different version of the rule so as to conform to the federal SSI rule; the Commissioner did so in July of 1983, but he has stipulated that he would not have done so but for the direction of the Secretary. The rule promulgated by the Commissioner after state rulemaking proceedings still differs in several minor respects (described infra n. 8) from the $6,000/6% rule now in use at the federal level.
Plaintiff Maine Association of Interdependent Neighborhoods, Inc. (MAIN) is a nonprofit corporation composed of eight affiliated groups with a total of over 1,100 members. A majority of those members are Medicaid recipients, and one of MAIN's purposes is to assist these members in obtaining and maximizing their entitlement to the benefits of various public assistance programs. MAIN participated in the state rulemaking proceedings prior to the Commissioner's promulgation of the state $6,000/6% rule, and thereafter, in August of 1983, MAIN filed an action in state court against the Commissioner and the Secretary *1313 seeking review of the state rule pursuant to the judicial review provision of the state APA, Me.Rev.Stat.Ann. tit. 5, § 8058 (1964 & Supp.1986). The Secretary removed the case to this Court.
Plaintiff Nancy Haggan is a 38-year-old woman who suffers from multiple sclerosis. She is bedridden and requires constant nursing care; she lives at home with her husband, self-employed lumberman Clifford Haggan, and their eleven-year-old son. She and her husband are members of MAIN. In 1983, the Commissioner determined that Haggan was eligible for Medicaid as an SSI-related medically needy individual, but in June of 1984, her coverage was terminated due to her husband's ownership of lumbering equipment that failed to satisfy the state $6,000/6% rule. She reapplied for coverage in December of 1984, but that application was denied, both initially and on administrative appeal, on the ground that the lumbering equipment failed to satisfy the $6,000/6% rule. In April of 1985 Haggan filed an action against the Commissioner in state court seeking review of this final agency action, pursuant to Me.Rev.Stat.Ann. tit. 5, § 11001 (1964 & Supp.1986), and challenged the validity of the state $6,000/6% rule pursuant to 42 U.S.C. § 1983 (1982). The Commissioner thereupon removed the case to this Court and filed a third-party complaint against the Secretary seeking a declaration that, if the state rule violated federal law, so too did the federal rule.
Subsequently, the cases were consolidated. Plaintiffs filed a Second Amended Complaint naming as defendants both the Commissioner and the Secretary and requesting declaratory and injunctive relief as well as attorneys' fees pursuant to 42 U.S.C. § 1988 (1982). The parties submitted the case for decision on a stipulated record; the Secretary filed a motion to dismiss, asserting that Plaintiffs' claims were barred by sovereign immunity and were moot and that the Commissioner's third-party complaint against the Secretary failed to allege a sufficient case or controversy. Shortly thereafter, Haggan moved for, and the Court issued, a preliminary injunction restraining Defendants from computing her Medicaid eligibility for the current eligibility period according to the $6,000/6% rule. See Maine Ass'n of Interdependent Neighborhoods, Inc. v. Petit, 647 F.Supp. 1312 (D.Me.1986). The case is now ripe for a decision on the Secretary's motion to dismiss and, because the Court will deny that motion, a decision on the merits of the case.

II. THE SECRETARY'S MOTION TO DISMISS
The Secretary asserts three grounds for his motion to dismiss: mootness, sovereign immunity, and want of a case or controversy. The Court, dealing with each of these in turn, concludes that the motion must be denied.

A. Mootness

The Secretary argues that the entire case (with the exception of Haggan's request for review of the denial of her December 1984 reapplication for Medicaid coverage) is mooted by the promulgation, in compliance with the federal APA, of a new $6,000/6% rule. See 50 Fed.Reg. 42685 (Oct. 22, 1985), codified at 20 C.F.R. §§ 416.1220-.1224 (1986). He points to the fact that prior to removal and consolidation, the state court pleadings in both of these cases sought to invalidate the $6,000/6% rule on the ground that, although the Secretary used it and required the Commissioner to use it, it had not been properly promulgated through publication in the Federal Register. The parties stipulate that the regulation that was in fact published at 40 Fed.Reg. 48916 (Oct. 20, 1975) "inadvertently" failed to include the $6,000/6% rule. Now that proper publication has occurred, the Secretary argues, the claims made in state court are moot. He argues that jurisdiction is tested by the case as it was in state court and, because the claims made in state court are now moot, the case in its present posture in this Court must also be moot.
But this Court reads each of these Plaintiff's state court complaints as having raised substantive as well as procedural challenges to the rule. Moreover, after *1314 removal Plaintiffs filed a joint Second Amended Complaint which, the Secretary acknowledges, raises numerous substantive and procedural challenges to the rule. And it is settled that "[i]f the federal court has jurisdiction of the removed cause and if the amendment to the complaint could have been made had the suit originated in federal court, the fact that the federal court acquired jurisdiction by removal does not deprive it of power to allow the amendment." Freeman v. Bee, 319 U.S. 448, 451, 63 S.Ct. 1146, 1148, 87 L.Ed. 1509 (1943). The Court concludes that, because the validly amended complaint asserts live claims, new promulgation does not render moot Plaintiffs' challenges to the rule.
Somewhat more troubling is the Secretary's suggestion that neither Plaintiff has been adversely affected by the newly promulgated rule or by the rule prior to promulgation. Although the Secretary characterizes this as a mootness argument, the Court interprets it as a challenge to Plaintiffs' standing. It is clear that Haggan has standing; she was adversely affected by the $6,000/6% rule prior to its formal promulgation, and this Court will not require her to go through the empty exercise of applying for and being denied Medicaid benefits again, simply because the rule has now been published in the Federal Register. Whether MAIN has been adversely affected by the rule is less clear.
MAIN's original complaint alleges that the majority of members of its constituent organizations are Medicaid recipients and have been adversely affected by the actions of Defendants, but nowhere does the complaint specifically allege that any individual member was denied benefits because of the $6,000/6% rule. In response to the Court's expression of doubt as to MAIN's standing, MAIN's president has submitted an affidavit declaring that Nancy and Clifford Haggan are MAIN members, but there is no evidence that any other MAIN members have been adversely affected by the $6,000/6% rule. Ordinarily
an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). In the instant case, these requirements are either satisfied by MAIN or obviated by Haggan's presence as a party. But, were it not for Haggan's membership in MAIN, MAIN would have no standing. The question presented, then, is whether an association has standing to sue on behalf of its only member with standing to sue in her own right when that member has in fact sued in her own right.
The Court concludes that Haggan's presence as a party does not deprive MAIN of standing. Defendants have not cited nor is the Court aware of any case holding that an association loses standing in these circumstances. An association does not have "second class" standing, to be recognized only if its members are under some disability preventing them from coming forward to protect their own rights; this argument was urged upon the Supreme Court in Hunt, 432 U.S. at 342, 97 S.Ct. at 2441, but the Court declined to accept it. Arguably, the identity of MAIN's complaint to Haggan's and MAIN's failure to allege any independent grounds for relief might warrant the invocation of prudential standing rules to bar MAIN's participation in this case. But to invoke such rules here would "`serve no functional purpose.'" Kozera v. Spirito, 723 F.2d 1003, 1006 (1st Cir.1983) (quoting City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 243, 103 S.Ct. 2979, 2982, 77 L.Ed.2d 605 (1983)). There is no risk that MAIN will (1) assert Haggan's rights in a manner hostile to those interests, (2) force the adjudication of unnecessary constitutional questions, or (3) cause unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative. *1315 Cf. Kozera, 723 F.2d at 1006. Therefore, MAIN has standing.[2]

B. Sovereign Immunity

The Secretary next asserts that the action should be dismissed because sovereign immunity bars the relief Plaintiffs request against both Defendants. It is clear, however, that Plaintiffs' claims for declaratory and injunctive relief fall within the "prospective relief" exception to the bar of sovereign immunity, where a plaintiff charges that an official has acted beyond his or her statutory authority. See Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689-90, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949); Kozera, 723 F.2d at 1008. On this basis, the Court has already determined, by Order dated December 6, 1984 accepting the Magistrate's Recommended Decision, that sovereign immunity does not bar the claims for prospective relief against either Defendant.
A more difficult question is whether eleventh amendment sovereign immunity bars Haggan's claim that the Commissioner improperly relied on the $6,000/6% rule to deny her December 1984 application for Medicaid coverage. Because the Court concludes, infra, that reliance on that rule was improper, Haggan's eligibility from December 1984 forward must be recomputed without regard to the $6,000/6% rule. If this recomputation establishes that she was otherwise eligible, then this Court's decision may have the effect of requiring a payment out of the state treasury to meet a previously-accrued liability. At first blush this might appear to run afoul of the prohibition on retrospective relief as developed in Edelman v. Jordan, 415 U.S. 651, 667-68, 94 S.Ct. 1347, 1357-58, 39 L.Ed.2d 662 (1974), and its progeny.
The Court concludes, however, that the Commissioner has waived any eleventh amendment sovereign immunity he might claim. It is undisputed that the Maine legislature has waived the Commissioner's common law sovereign immunity to Haggan's state court claims for judicial review of the administrative denial of her application. See Me.Rev.Stat.Ann. tit. 5, § 11001(1); cf. Maine v. Thiboutot, 405 A.2d 230 (Me.1979), aff'd on other grounds, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). By removing the case to this Court, the Commissioner has waived eleventh amendment sovereign immunity as well. See Newfield House, Inc. v. Massachusetts Dep't of Public Welfare, 651 F.2d 32, 36 n. 3 (1st Cir.), cert. denied, 454 U.S. 1114, 102 S.Ct. 690, 70 L.Ed.2d 653 (1981); Gallagher v. Continental Ins. Co., 502 F.2d 827, 830 (10th Cir.1974); Colorado Health Care Ass'n v. Colorado Dep't of Social Services, 598 F.Supp. 1400, 1406 (D.Colo.1984) (holding that state Department of Social Services, by removing case to federal court, waived its eleventh amendment protection against order for retroactive reimbursement of Medicaid benefits).
Of course, where a state officer is not authorized to waive eleventh amendment sovereign immunity, removal by that officer may not constitute a waiver. Silver v. Baggiano, 804 F.2d 1211, 1214 (11th Cir.1986); Gwinn Area Community Schools v. State of Michigan, 741 F.2d 840, 846-47 (6th Cir.1984); David Nursing Home v. Michigan Dep't of Social Services, 579 F.Supp. 285, 188 (E.D.Mich.1984). But the Maine Attorney General appears to have such power. It is true that the Maine Law Court has left open the question whether the Maine Attorney General may waive the State's common law sovereign immunity, Cushing v. Cohen, 420 A.2d 919, 923-24 (Me.1980). But that is not the issue here. Rather, this case presents the related but distinct question whether the Attorney General, who represents the Commissioner in this action, may waive Maine's *1316 eleventh amendment immunity to claims as to which the Maine legislature has already waived the State's common law sovereign immunity. Although "[a] state waiver of sovereign immunity in its own courts does not necessarily imply waiver of its eleventh amendment immunity," Della Grotta v. Rhode Island, 781 F.2d 343, 346 (1st Cir.1986), certainly a state officer's power to waive eleventh amendment immunity in federal court is greater where, as here, the state legislature has waived common law immunity to identical suits in state court.
Moreover, the factors that led the First Circuit in Newfield House, 651 F.2d at 36 n. 3, to conclude that the Massachusetts Attorney General could waive the Commonwealth's eleventh amendment immunity are equally present here. First, the Attorney General, by removing the case, has represented that he has the power to waive Maine's eleventh amendment immunity. Second, the Attorney General has broad power to direct state litigation in all fora. Compare Me.Rev.Stat.Ann. tit. 5, § 191 and Central Maine Power v. Public Utilities Comm'n, 382 A.2d 302, 315 (Me.1978) with Mass.G.L. ch. 12, § 3 (1986) (relied upon in Newfield House) and Feeney v. Commonwealth, 373 Mass. 359, 366-67, 366 N.E.2d 1262 (1977) (relied upon in Newfield House). Third, the Attorney General may, "in the absence of some express legislative restriction to the contrary exercise all such power and authority as public interest may, from time to time require, and may institute, conduct and maintain all such actions and proceedings as he deems necessary...." Lund ex rel. Wilbur v. Pratt, 308 A.2d 554, 558 (Me.1973); compare Multi-Line Ins. Rating Bureau v. Commissioner of Ins., 357 Mass. 19, 22, 255 N.E.2d 787 (1970) (holding that Massachusetts Attorney General has all powers reasonably necessary or incidental to the office; relied upon in Newfield House).
The Court's conclusion that the Commissioner has waived eleventh amendment immunity is strengthened by the fact that the Commissioner has, after removal, filed a third-party complaint in this action against the Secretary. Cf. Paul N. Howard Co. v. Puerto Rico Aqueduct Sewer Auth., 744 F.2d 880, 886 (1st Cir.1984) (holding that a state agency, by voluntarily appearing in federal court and filing counterclaim and third-party complaint, waived whatever eleventh amendment immunity it may have enjoyed), cert. denied, 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 970 (1985); cf. Burgess v. M/V TAMANO, 382 F.Supp. 351, 355-56 (D.Me.1974) (holding that by filing an affirmative suit in federal court, Maine's Attorney General waived Maine's eleventh amendment immunity as to any counterclaim arising from the same event which was the subject of the State's action), vacated and remanded on other grounds, 564 F.2d 964 (1st Cir.1977); see generally, 13 C.Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3524 & nn. 75, 77 (1984 & Supp.1986) (discussing state's voluntary appearance or other conduct in litigation as a waiver of eleventh amendment immunity). Moreover, the Commissioner expressly declines to press any sovereign immunity argument to this Court, despite the Secretary's considerable emphasis on the issue. Cf. Colorado Health Care Ass'n, 598 F.Supp. at 1406 (finding that state agency waived eleventh amendment immunity by failing to assert the defense in the face of plaintiffs' specific arguments that immunity had been waived). In sum, eleventh amendment immunity is no bar to any of Plaintiffs' claims.

C. Want of a Case or Controversy

The Secretary finally argues as a ground for dismissal that no case or controversy exists between him and the Commissioner. He asserts that even if the state's $6,000/6% rule is invalid, Haggan may nevertheless fail, because of other eligibility problems, to establish her entitlement to Medicaid benefits from the Commissioner. Consequently, he asserts, it is speculative whether the Commissioner will seek federal matching payments from the Secretary and even more speculative whether the Secretary would refuse to make such payments or take any other action adverse to the Commissioner's interests as a result of the invalidation of the state's $6,000/6% *1317 rule. Moreover, the Secretary asserts, in the event of any such adverse action, the Commissioner would be required to exhaust his administrative remedies against the Secretary before proceeding in this Court.
But the facts of this case compel the conclusion that a case or controversy does exist between the Commissioner and the Secretary. The stipulated record establishes that the Secretary's Health Care Financing Administration recommended various actions against the Commissioner that would lead to financial penalties or possible reduction in federal financial participation unless the Commissioner adopted a $6,000/6% rule. The Commissioner stipulates that he would not have adopted the $6,000/6% rule in its present form but for the federal requirement that he do so. And all parties stipulate that Haggan was denied Medicaid benefits due to the application of this rule. Despite suggestions in the administrative record that Plaintiff Haggan may be ineligible for other reasons as well, this Court gives full force and effect to that stipulation, because it is not itself in a position to recalculate her eligibility and because neither Defendant presents any such calculations. The facts therefore establish that the Commissioner risks being ordered by this Court to recalculate Haggan's Medicaid eligibility in a way that subjects the Commissioner to a very real risk of adverse action by the Secretary. A case or controversy thus exists between these Defendants. Cf. Kozera v. Spirito, 723 F.2d 1003, 1005-07 (1st Cir.1983).
Equally without merit is the Secretary's argument that the Commissioner must exhaust his administrative remedies before proceeding in this Court. The Court has already determined, by Order dated December 6, 1984, accepting the Magistrate's Recommended Decision, that no exhaustion requirement applies in this case. Further development of the facts in an administrative proceeding before HHS would not focus the issues for a reviewing court, and HHS officials would in any case be bound in such a proceeding by the $6,000/6% rule. Here, as in Kozera, "[t]he administrative process simply could not provide the Commissioner with the relief that his third-party complaint seeksinvalidation of the federal regulation." Kozera, 723 F.2d at 1010. Requiring exhaustion would thus be a waste of administrative and ultimately of judicial resources. The Secretary's reliance on Newfield House, supra, 651 F.2d 32, is misplaced because that case involved neither a challenge to a federal regulation nor such a substantial risk that an exhaustion requirement would catch a state Medicaid administrator in a squeeze play between a court order and the Secretary's administrative sanctions. In the instant case, as in Kozera, retaining the Secretary as a third-party defendant will avoid such a squeeze play. See Kozera, 723 F.2d at 1006. This Court concludes that Kozera is controlling; on these facts exhaustion would be futile, a case or controversy exists between the two Defendants, and the Secretary's motion to dismiss must therefore be denied.

III. THE MERITS
Plaintiffs' challenges to the $6,000/6% rule are most logically considered first as they relate to the federal rule and then as they relate to the state rule. As set out more fully below, Plaintiffs challenge the federal rule as (1) procedurally invalid until at least October 22, 1985, and (2) substantively arbitrary and capricious, an abuse of discretion, and in violation of the Social Security Act at all times up to the present. Plaintiffs challenge the state rule because (1) it is impermissibly more restrictive than both the federal rule applicable when the state rule was enacted and the current federal rule; and (2) it was adopted in response to actions by the Secretary that allegedly violated the so-called "DEFRA moratorium" on actions against states with less restrictive Medicaid eligibility standards. Plaintiffs also challenge both Defendants' actions as violative of constitutional due process and equal protection guarantees. The Court addresses each of these arguments in turn.

*1318 A. Procedural Challenges to the Federal Rule

Rules relating to federal government grants and benefits are ordinarily exempt from the notice-and-comment rulemaking requirements of the APA, 5 U.S.C. § 553(a)(2) (1982). The Secretary has, however, elected to waive this exemption. See 36 Fed.Reg. 2532 (Jan. 28, 1971). The Secretary does not claim that the $6,000/6% rule is an "interpretative rule" and therefore exempt from notice-and-comment procedures under section 553(b)(A); indeed, at least one court considering the $6,000/6% rule has reached the opposite conclusion. See Herron v. Heckler, 576 F.Supp. 218, 230-32 (N.D.Cal.1983); see also Andrew v. Heckler, No. A83-321 CIV, slip op. at 9-10 (D.Alaska Aug. 11, 1983) (granting preliminary injunction against use of $6,000/6% rule, concluding that plaintiffs would likely succeed in showing that the rule was not interpretative). The Secretary was therefore bound to comply with section 553 in promulgating the $6,000/6% rule.
Yet, it is undisputed that, at least until October 22, 1985, the $6,000/6% rule had not been adopted in compliance with section 553's notice-and-comment procedures. The $6,000/6% rule was part of a rule previously published in proposed form, see 40 Fed.Reg. 12516 (March 19, 1975). But the resulting final rule, according to the parties' stipulation, "inadvertently" failed to include the $6,000/6% limitation; instead, it for the most part tracked the statutory language by excluding property "essential to self-support." See 40 Fed. Reg. 48916 (Oct. 20, 1975). Although the Secretary did include the $6,000/6% rule in his Program Operations Manual System (POMS), a manual for internal use by HHS and state DHS employees, the POMS was never promulgated in compliance with 5 U.S.C. § 553 (1982). The Court concludes that the final rule which failed to include the $6,000/6% limitation, rather than the POMS which did include the limitation, was in legal force until at least October 22, 1985.[3]See Herron, 576 F.Supp. at 230-32 (concluding that Secretary's failure to promulgate the $6,000/6% rule in compliance with APA notice and comment procedures rendered rule void and unenforceable).
The Secretary responds that the $6,000/6% rule is now valid because it was properly adopted through notice and comment procedures and made effective immediately upon publication in the Federal Register on October 22, 1985. 50 Fed.Reg. 42683 (Oct. 22, 1985). Plaintiffs respond that the Secretary's failure to delay implementation of the rule until thirty days after its publication, without good cause for such failure, violated section 553(d)(3). That section states that "[t]he required publication or service of a substantive rule shall be made not less than thirty days before its effective date, except... (3) as otherwise provided by the agency for good cause found and published with the rule." 5 U.S.C. § 553(d)(3) (1982). The only statement of "good cause" published with the rule was a claim that the rule was "urgently needed for accuracy and consistency in claims adjudication and appeals at the hearing level" and was therefore "being finalized at this time." 50 Fed.Reg. 42683-84 (Oct. 22, 1985).
Plaintiffs argue, the Secretary does not dispute, and this Court agrees that the reasons given for making the rule effective upon publication do not meet the "good cause" standard. The $6,000/6% rule was published in proposed form first in 1975, see 40 Fed.Reg. 12516 (March 19, 1975), and again in November 1982, see 47 Fed. Reg. 50511 (Nov. 8, 1982), nearly three years before its publication in final form. After such a long delay, this Court is unable to agree that the need for the $6,000/6% rule suddenly became urgent in *1319 October of 1985. The Secretary "cannot bootstrap himself into a position of emergency based on his own dilatory conduct." Ngou v. Schweiker, 535 F.Supp. 1214, 1216-17 (D.D.C.1982) (rejecting Secretary's argument that he had good cause for making rule effective twenty days after publication, where Secretary had approved rule thirty-two days before publication and thus had had ample time to comply with thirty-day requirement). The immediately effective date thus violated section 553(d)(3).
The next question concerns the proper remedy for such a violation. Plaintiffs urge the Court to invalidate the rule entirely, but the Court declines to adopt such a drastic approach. Most courts confronting such violations merely recompute the effective date by adding thirty days onto the publication date. See, e.g., Rowell v. Andrus, 631 F.2d 699, 704 (10th Cir.1980); United States v. Gavrilovic, 551 F.2d 1099, 1106 (8th Cir.1977); Lewis-Mota v. Secretary of Labor, 469 F.2d 478 (2d Cir.1972). Courts that void the rule entirely have done so on the basis that the agency in question not only made the rule immediately effective upon final publication, as did the Secretary here, but also omitted previously to publish the rule in proposed form. See Sannon v. United States, 460 F.Supp. 458, 468 (S.D.Fla.1978); City of New York v. Diamond, 379 F.Supp. 503, 515-18 (S.D.N. Y.1974). The failure to publish the rule in proposed form completely denied interested persons the opportunity to comment and thus constituted a more significant and substantive violation of the whole notice and comment scheme of section 553 than that committed by the Secretary in the instant case.
One court has added forty-nine days onto the publication date, partly because of the special factual circumstances of the case and partly because of its view that merely adding thirty days "should be questioned because it invites violations of section 553(d)." Ngou, 535 F.Supp. at 1217. While the latter argument is persuasive, in the instant case no special factual circumstances suggest a remedy that would have more deterrent value than adding thirty days to the publication date yet stop short of completely invalidating the rule. The Court concludes that the appropriate remedy here is to add thirty days onto the publication date, thus making the regulation published in the Federal Register on October 22, 1985 effective as of November 21, 1985.

B. Substantive Challenges to the Federal Rule

Plaintiffs allege that the adoption of the federal $6,000/6% rule was arbitrary and capricious and an abuse of discretion, in violation both of section 10(e) of the APA, 5 U.S.C. § 706 (1982), and 42 U.S.C. § 1382b(a)(3) (1982). More specifically, Plaintiffs allege that (1) there is no credible evidence in the record to support the rule; (2) the rule results in the inclusion of resources which are in fact essential to claimants' self-support; (3) the rule fails to account for inflation; and (4) the Secretary failed to consider reasonable alternative methods for ascertaining whether property is in fact essential to claimants' self-support. The Court addresses each of these arguments in turn.
Initially, though, it must be recognized that in the Medicaid context, and particularly where, as here, the Secretary's rule is grounded on an explicit delegation of rulemaking authority, the rule is entitled to great weight. See Atkins v. Rivera, ___ U.S. ___, 106 S.Ct. 2456, 2461, 91 L.Ed.2d 131 (1986); Hogan v. Heckler, 769 F.2d 886, 888, 892 (1st Cir.1985), cert. denied, ___ U.S. ___, 106 S.Ct. 3301, 92 L.Ed.2d 715 (1986). But a rule may still be overturned if it is arbitrary, capricious, or manifestly contrary to the statute. Atkins, 106 S.Ct. at 2461 (citing, Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)).

1. Lack of Credible Evidence

Although the APA's "substantial evidence" standard of review is by its own terms applicable only to formal rather than notice and comment rulemaking, see 5 U.S.C. § 706(2)(E), the courts of appeals *1320 are generally in agreement that review of notice and comment rulemaking on the "arbitrary and capricious" and "abuse of discretion" standards encompasses an inquiry into whether the rule is supported by substantial evidence. See Pacific Legal Found. v. Dep't of Transportation, 593 F.2d 1338, 1343 n. 35. (D.C.Cir.), cert. denied, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979). Even if the two standards are not precisely the same, see Western Union Tel. Co. v. FCC, 665 F.2d 1126, 1148 n. 45 (D.C.Cir.1981), the Court agrees that "when an agency engages in substantive rule-making, it abuses its discretion (or acts arbitrarily or capriciously) if its actions are not supported by substantial evidence." National Nutritional Foods Association v. Weinberger, 512 F.2d 688, 705 (2d Cir.) (Lumbard, J., concurring), cert. denied, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975).
The Secretary acknowledges that the $6,000/6% rule was based on a 1973 study encompassing (1) a survey of 600 claims involving income-producing property and (2) a survey of the rules for exempting nonbusiness property essential to self-support used at that time by various states in administering their own programs for the needy aged, blind, and disabled. See also 50 Fed.Reg. 42685 (Oct. 22, 1985) ("It is true that the proposed limits on property essential to self-support were based on an earlier survey.") The study itself was destroyed in a "routine file purge" sometime prior to the second publication of the $6,000/6% rule in proposed form in November of 1982. What survives is a two-page summary of the study, prepared in December of 1973. See S.R. 171-72.
Based on this summary, Plaintiffs' expert economist, Dr. Michael F. Sheehan, challenges various aspects of the study and its use in arriving at the $6,000/6% rule. Dr. Sheehan does not seriously challenge the source of the requirement that property be included in the computation of resource eligibility if it produces less than a 6% return; this figure grew out of a determination that "[i]n the present [1973] economy, 6 percent is generally accepted as a rate of return which could be realized if the property were converted to cash and placed in a savings account." S.R. 171. Rather, Dr. Sheehan concentrates his attack on the derivation and relevance of the requirement that property must also be included if the claimant's equity value in it exceeds $6,000. He makes three main points.
First, the survey of 600 claims apparently showed that most of the properties that did not produce a 6% return were "properties having higher values"; many were worth more than $6,000.[4] On this basis, the author of the study summary concluded that "requiring a net return of at least 6 percent of its value in order to consider property of modest value to be essential to self-support would not be unreasonable." S.R. 172. Dr. Sheehan suggests that, putting aside the question whether that correlation offered any support for a 6% return requirement for property of "modest value," the observed correlation in no way suggested that "properties having higher values" should be included in toto without regard to the return they provide. In other words, whatever might be the arguments supporting a 6% return requirement, the study summary offers no support for an independent requirement based solely on asset value.
The Court agrees that whatever correlation there may have been between assets valued at greater than $6,000 and a less-than-6% return on those assets, the study summary merely assumed rather than established that this correlation was equivalent to causation. In other words, nothing in the study summary ever attempted to explain why assets valued at more than $6,000 should usually produce a return of less than 6%. And, if the correlation in fact held, then the study summary did not *1321 explain why an asset value limit was necessary at all; if assets worth more than $6,000 really produced less than a 6% return, then including assets producing less than a 6% return would automatically have included assets worth more than $6,000, without the need for a separate $6,000 asset value limit. The $6,000 limit thus appears either irrational or superfluous; the survey of 600 claims did not provide credible evidence to support it.
Second, the survey of state practices was said to support the $6,000 limit. Three different approaches were in use at the time:
[1] A number of states exclude the value of nonbusiness property if it is producing a reasonable rate of return needed for the claimant's support and maintenance. [2] Others do not exclude such income-producing property but consider its value in their overall resource limit. [3] Of the states that place a limit on the value of income-producing property, the highest identifiable amount is $6,000. This would appear to be a reasonable limit for [SSI] purposes as well.
S.R. 172. But Dr. Sheehan points out that this 1973 study summary provided no evidence as to how many states were actually surveyed or what their relevant practices, if any, might have been in 1985 when the current federal $6,000/6% rule was promulgated. Nor did the study summary explain why it was reasonable to choose a property value limit approach from among the three approaches being used by the states at some unspecified time prior to 1973, nor how many of the states surveyed had actually chosen this approach, nor how state practices with respect to nonbusiness property were relevant to the choice of a rule for business property.[5]
The Secretary responds that Congress set SSI benefit levels to correspond to the average benefit level then being offered by the states, and he argues that he cannot be faulted for choosing the highest asset value limit (i.e., the most liberal from the claimant's perspective) then being used by those states using asset value limits for property exclusion purposes. But it is obvious to the Court that the study summary in no way indicated what the actual average practice was among all the states in 1973; it merely adopted without explanation one of several approaches used by an unknown number of states at some unknown time prior to 1973. The study summary thus did not provide credible evidence to support a $6,000 asset value limit in 1973, let alone 1985.
Third, the study summary never explained why a higher asset value rendered the asset nonessential to the claimant's means of self-support. The study summary relied on data from the survey of 600 new claims involving income-producing assets to establish the validity of the $6,000 asset value limit. That survey found that a large proportion of the income-producing assets involved were worth less than $6,000; the proportion of assets worth less than $6,000 ranged from 48% of rented farms to 96% of service businesses. The proportion of assets worth less than $10,000 ranged from 74% of rented farms to 97% of service businesses. But just what the actual values of these assets had to do with whether they were essential to the owners' means of self-support was left completely to the imagination. The evidence merely showed that of the 600 claimants surveyed (and the study summary never stated whether these were federal or state claimants or when they applied for benefits), a large proportion of them owned income-producing assets valued at less than $6,000 and an even larger proportion owned income-producing assets worth less than $10,000. This evidence did not even remotely suggest that owners of assets worth more than $6,000 or $10,000 did not *1322 find those assets essential to their means of self-support. Nor did the survey establish that $6,000 was in any way a logical dividing line above which the number of properties studied in the survey fell sharply.
In sum, the study summary, based on data from 1973 or earlier, did not provide substantial credible evidence to support the Secretary's adoption in 1985 of a $6,000 asset value limit. Instead, it appears that the $6,000 figure was more or less plucked out of thin air, for reasons this Court is unable to ascertain. Moreover, the study summary, while it found a 6% requirement reasonable in 1973, offered no evidence to support the conclusion that such a requirement was reasonable in 1985; and Congress specifically encouraged the Secretary to adjust the rate-of-return requirement to meet changing conditions. See H.R.Rep. No. 231, 92d Cong., 1st Sess. (1971), reprinted in 1972 U.S. Code Cong. & Admin. News 4989, 5139-40 ("The exclusion [of nonbusiness income-producing property] would be based on a fixed percentage return, to be set forth in the regulations of the Secretary, in order to permit adjustments for changing economic conditions.") (emphasis added). Because the study summary is the only evidence offered by the Secretary to support the $6,000/6% rule, the Court concludes that the Secretary acted arbitrarily and capriciously and abused his discretion in adopting the rule.

2. Inclusion of Resources in Fact Essential to Claimant's Means of Self-Support

Plaintiffs argue that the Secretary's adoption of the $6,000/6% rule was arbitrary and capricious, an abuse of discretion, and in excess of statutory authority because it results in the inclusion of resources that are in fact essential to a claimant's means of self-support, i.e., resources that Congress, in passing section 1382b(a)(3), intended the Secretary to exclude. Dr. Sheehan offers the example of a claimant holding $6,000 in equity in an asset producing a 6% return, thus netting $360 per year; assuming optimistically that the return was as high as 20%, the net would still be only $1200 per year. Taken alone, he argues, these amounts are marginal rather than essential to self-support. On the other hand, a claimant holding $50,000 in equity in an asset producing a 10% return and thus netting $5,000 per year could conceivably survive (at the poverty line) on this amount but would be forced to liquidate this asset in order to establish SSI eligibility. In other words, the effect of the $6,000/6% rule is to exclude (and thus permit continued ownership of) property that makes only a marginal contribution to a claimant's means of self-support while including (and thus encouraging liquidation of) property that is truly essential. It is important to note that numerous commenters made these same points before the promulgation of the new rule in October 1985. See S.R. 142, 144-45, 147, 151-52, 178.
Dr. Sheehan acknowledges that the $6,000/6% rule would operate so as to render ineligible a claimant who derives her entire income through holding, for example, $1,000,000 in equity in an asset producing a 10% return for a net of $100,000 per year. This is hardly the sort of claimant about whom Congress was concerned, and the $6,000/6% rule would be doing its job by rendering such a claimant ineligible.
But several commenters suggested that existing income limits were adequate to ensure that such claimants would be found ineligible. And the Secretary never explained why he chose to address such situations indirectly, through an asset value limit, rather than more directly through an income limit on eligibility. It seems self-evident that the purpose of Congress in excluding from resource eligibility calculations only those assets essential to self-support was not to provide a surrogate for income eligibility guidelines. Rather, Congress intended to avoid forcing claimants to liquidate any essential business assets and those nonbusiness assets producing a reasonable return, because liquidation would render such claimants more dependent on SSI and related programs. See H.R. Rep. No. 231, 92d Cong., 1st Sess. (1971), reprinted in 1972 U.S. Code Cong. & Admin. *1323 News 4989, 5139-40 ("[The House] committee believes that where income producing property is not used as part of a trade or business, the value of such property should be excluded from the resources limitation only to the extent it is producing a reasonable return [,] and the bill so provides.") The Secretary offered no explanation of how an asset value limit serves the purpose of avoiding liquidation or of why an asset that produces a 6% return but is worth more than $6,000 is ipso facto rendered nonessential to self-support.
The Court agrees, therefore, that the $6,000/6% rule operates in a fashion that is highly likely to include resources that are in fact essential to claimants' means of self-support. The adoption of the rule was thus arbitrary and capricious, an abuse of discretion, and in excess of the authority granted the Secretary by 42 U.S.C. § 1382b(a)(3) (1982).

3. Failure to Account for Inflation

Plaintiffs argue that the rule is arbitrary, capricious and an abuse of discretion because it is based on survey data from 1973 or earlier and thus completely fails to account for inflation since that time. Plaintiffs point out that according to the Consumer Price Index, the purchasing power of the dollar was at least 2.41 times higher in 1973 than it is today. Assuming that the Secretary's adoption of some asset value limit approach were rational (contrary to the Court's conclusions above), a $6,000 limit in 1973 suggests that a $14,460 limit would be rational today; adhering to the $6,000 limit today would be the equivalent of having imposed a $2,490 limit in 1973.
During the notice and comment procedure leading to the rule currently in force, several commenters pointed out that HHS had not taken inflation into account, S.R. 176, 180, but the Secretary completely failed to address this point. See 50 Fed. Reg. 42685 (Oct. 22, 1985) (recognizing but not responding to the point that the $6,000 limit "does not take into account the high inflation since the start of the program"). The parties have stipulated that HHS discussed the question internally but declined to make any adjustment for inflation "in the absence of a legislative mandate and in the context of a climate of fiscal constraint." S.R. 216. The Secretary here argues that the desirability of fiscal restraint in controlling inflation, reducing the tax burden on the general public, and controlling the cost of living to the categorically needy justifies retaining the $6,000 limit arrived at in 1973.
This Court simply cannot agree. Vague references to a congressional mandate to control inflation cannot justify reducing by a factor of 2.41 the equity value of assets deemed "essential to the means of self-support" of SSI claimants within the meaning of section 1382b(a)(3). On the contrary, to the extent that Congress contemplated the use of an asset value limit at all, it is clear that Congress preferred the Secretary to base regulations on current rather than twelve-year-old data. Such was certainly Congress's intent with respect to the percentage return limit. Cf. H.R.Rep. No. 231, 92d Cong., 1st Sess. (1971), reprinted in 1972 U.S.Code Cong. & Admin.News 4989, 5140 ("The exclusion would be based on a fixed percentage return, to be set forth in the regulations of the Secretary, in order to permit adjustments for changing economic conditions.")[6] Even granting that the Secretary has been delegated exceptionally broad discretion in this area, his discretion does not reach this far. The Court therefore concludes that the Secretary's failure to take inflation into account was arbitrary, capricious, and an abuse of discretion.

4. Failure to Consider Reasonable Alternative Methods for Ascertaining Whether Property is in Fact Essential to Self-Support

Plaintiffs argue that the adoption of the $6,000/6% rule was arbitrary, capricious, and an abuse of discretion because *1324 the Secretary failed to consider reasonable alternative methods for ascertaining whether property is in fact essential to self-support. Plaintiffs concede that the existence of alternatives does not in itself establish that the regulation actually promulgated is invalid; a court should not second-guess whether an administrator has chosen the "best" approach among a range of reasonable alternatives. An administrator is obligated, however, to consider the range of reasonable alternatives. See, e.g., Motor Vehicles Manufacturers' Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 46-51, 103 S.Ct. 2856, 2868-71, 77 L.Ed.2d 443 (1983). On this record, the Court is persuaded that the Secretary did not meet this obligation.
One alternative method was contained in the validly promulgated regulations legally in effect through October 1985 but ignored in the POMS manual used for the adjudication of claims. See 40 Fed.Reg. 48916 (Oct. 20, 1975). These regulations required exclusion of trade or business property "if its current market value does not exceed limits which take into account the nature of the business and the gross and net income such business may be expected to produce in light of such property." 20 C.F.R. § 416.1222(b) (1984). Nonbusiness property was to be excluded "if it is relied upon by the individual in producing income on which he can live, it is used to produce goods essential to the support of the individual, or it is used to provide service essential to the individual's support." Id. at § 416.1224. Several commenters suggested that these regulations were sufficiently flexible to exclude claimants with excess resources while protecting those struggling to maintain self-sufficiency through a small farm or business. See S.R. 144-45, 147. But the Secretary's only response as to why those regulations were dropped in favor of the $6,000/6% rule was the statement in the preamble to the new rule that it was "urgently needed for accuracy and consistency in claims adjudication and appeals at the hearing level" and therefore was being made effective immediately. 50 Fed.Reg. 42683-84 (Oct. 22, 1985).
These conclusory assertions about administrative convenience offer no more support for rejecting the old rules than they offer for the invocation of the "good cause" exception to the APA's thirty-day notice period, discussed above.
Moreover, if administrative convenience was the goal, the Secretary nowhere explained the rejection of a formula, proposed during the notice and comment procedure, that appears to be much simpler than the $6,000/6% rule and achieves its basic goals but does not rely on an asset value limit with all its attendant problems. Under this formula, the asset value would be multiplied by a rate of return determined by the Secretary to be reasonable; this "expected income" figure (or, Dr. Sheehan suggests, the actual income figure, if it were higher) would simply be counted toward the claimant's income, which would then be (as it is currently) compared to income eligibility guidelines that vary according to family size and other claimant characteristics. This approach would appear to encourage the liquidation of unproductive assets, permit retention of assets truly essential to self-support, and exclude the hypothetical claimant discussed supra with the $1,000,000 asset returning 10%.
This Court possesses neither the authority nor the expertise to conclude that such a formula would actually be "better" than the $6,000/6% rule in fact adopted; that task is for the Secretary. But the Court is fully capable of surveying the record and concluding that, despite its having been proposed, the Secretary never gave serious consideration to such an approach. The promulgation of the $6,000/6% rule was therefore arbitrary, capricious, and an abuse of discretion.[7]

C. Challenges to the State Rule

1. Impermissible Stringency as Compared With the Federal Rule

Plaintiffs argue that the state $6,000/6% rule is invalid because at the *1325 time it was enacted, in July of 1983, it was more restrictive than the federal rule then in legal force.[8] As the Court concluded above, until November 21, 1985 the federal rule in legal force did not include a $6,000/6% limitation; rather, for the most part, it tracked the statutory language in excluding property "essential to self-support." See 40 Fed.Reg. 48916 (Oct. 20, 1975), codified at 20 C.F.R. §§ 416.1220-.1224 (1984). Plaintiffs allege that the more restrictive state rule thus violated the requirement of 42 U.S.C. § 1396a(a)(17)(B) (1982) that state Medicaid programs must
include reasonable standards ... for determining eligibility for [Medicaid] ... which ... provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant or recipient and (in the case of any applicant or recipient who would, except for income and resources, be eligible ... to have paid with respect to him supplemental security income benefits ...) as would not be disregarded (or set aside for future needs) in determining his eligibility for [SSI] ....
(Emphasis added.) SSI-related medically-needy eligibility standards that are more restrictive than applicable federal SSI eligibility standards violate section 1396a(a)(17)(B). See Randall v. Lukhard, 709 F.2d 257 (4th Cir.1983), aff'd in part, rev'd in part on other grounds on reh'g, 729 F.2d 966 (4th Cir.) (en banc), cert. denied, 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984); Caldwell v. Blum, 621 F.2d 491, 496 (2d Cir.1980), stay denied, 446 U.S. 1311, 100 S.Ct. 1635, 64 L.Ed.2d 225 (Marshall, Circuit Justice, 1980), cert. denied, 452 U.S. 909, 101 S.Ct. 3039, 69 L.Ed.2d 412 (1981). Also relevant is 42 U.S.C. § 1396a(a)(10)(C)(i)(III) (1982), which requires that the methodology to be employed by the state in determining medically-needy eligibility Medicaid "shall be the same methodology which would be employed under the [SSI] program...." See Morris by Simpson v. Morrow, 783 F.2d 454, 461-62 (4th Cir.1986) (concluding that $6,000/6% rule is a "methodology" rather than a "standard"). But see Atkins v. Rivera, ___ U.S. ___, 106 S.Ct. 2456, 2462-63, 91 L.Ed.2d 131 (1986) (concluding that purpose of "same methodology" language of section 1396a(1)(10)(C)(i)(III) was to invalidate regulations permitting income and resource standards in state Medicaid plans to deviate from those used in AFDC and SSI programs). The Secretary's own regulations also declare that state SSI-related medically-needy eligibility requirements must not be more restrictive than those used under SSI. 42 C.F.R. § 435.401(c)(2) (1986); cf. Caldwell, 621 F.2d at 495-97; Fabula v. Buck, 598 F.2d 869, 872 (4th Cir.1979). But see Dawson v. Myers, 622 F.2d 1304, 1313-14 (9th Cir.1980) (concluding that 42 C.F.R. § 435.401 has no bearing on the validity of states' financial eligibility requirements), vacated and remanded on other grounds sub nom. Beltran v. Myers, 451 U.S. 625, 101 S.Ct. 1961, 68 L.Ed.2d 495 (1981)).
The Commissioner does not dispute Plaintiffs' claim that the state rule when promulgated was more restrictive than the federal rule, 20 C.F.R. §§ 416.1220-.1224 (1984), then in legal force. Rather, the Commissioner's argument is that because the $6,000/6% rule contained in the Secretary's POMS was in fact being used in SSI eligibility determinations, the state's use of the rule for Medicaid eligibility purposes was not impermissibly restrictive. The Commissioner argues that for Medicaid to be administered otherwise could cause an *1326 inconsistent result whereby an applicant could be found resource-ineligible for SSI yet resource-eligible for SSI-related Medicaid, despite federal requirements that the two programs adhere to the same resource eligibility guidelines.
Although the Commissioner's position may be a difficult one, the law entitles SSI-related Medicaid claimants to have their eligibility determined at the state level according to standards no more restrictive than those legally in force at the federal level. First, the Commissioner was well aware, at the time he promulgated a new $6,000/6% rule in response to the federal pressure in July of 1983, that the federal rule contained in the Secretary's POMS was more restrictive than the rule published in the Federal Register and very possibly invalid on that ground. The Commissioner could have resisted the pressure exerted by the Secretary, cf. Cubanski v. Heckler, 781 F.2d 1421, 1424-29 (9th Cir. 1986), dissent from denial of reh'g en banc, 794 F.2d 540 (9th Cir.1986), petition for cert. filed, 55 U.S.L.W. 3426 (U.S. Nov. 26, 1986), or otherwise have sought a determination as to the state's right to implement a rule no more restrictive than that published in the Federal Register.
Second, under the circumstances of this case, either Haggan or the Commissioner must to some extent pay the price for the Secretary's improper actions. The Commissioner is clearly in a better position to do so.
Finally, it does seem likely that Congress wished to avoid inconsistent results such as those feared by the Commissioner. But it seems even more likely that Congress did not wish to deny SSI-related Medicaid claimants a retroactive recomputation of their eligibility when SSI eligibility requirements that were improperly used by the Secretary and adopted under pressure by the Commissioner are later invalidated in a proper appeal from the Commissioner's administrative finding of ineligibility. The Court concludes that the Commissioner's use of the $6,000/6% rule to deny Haggan's December 1984 application violated her rights under 42 U.S.C. §§ 1396a(a)(10)(C)(i)(III), 1396a(a)(17), and 20 C.F.R. §§ 416.1220-.1224 (1984).[9]
The Commissioner's fallback argument is that, whatever the defects in the federal $6,000/6% rule, for Medicaid purposes these defects have been cured because the state rule was adopted in conformance with the notice and comment procedures of the state APA, Me.Rev.Stat.Ann. tit. 5, §§ 8052-53. The record demonstrates, however, that in this case the state rule-making procedure was a meaningless formality. The introductory statement accompanying the state's new $6,000/6% rule made clear (and the Commissioner has stipulated, S.R.2) that the rule would have been adopted in the current form to meet federal requirements regardless of any concerns expressed through the notice and comment process:
Both the oral comments from the public hearing and written comments have been reviewed. Some of the suggestions have been adopted. Some of the comments simply required further clarifications for specific policies which will be incorporated in this memo. All the comments were evaluated. Some comments were contrary to the requirements of [the Secretary's Health Care Finance Administration] to bring the State into compliance. While the comments regarding the POMS material vs. 20 CFR may or may not be valid, HCFA requires the State to apply the same policies and procedures as SSI based on the POMS material. This was the original reason the State was cited for being out of compliance.
S.R. 24 (emphasis added). Even if the record did establish that the Commissioner adopted the rule on its merits and without federal pressure to do so, the state rule is just as arbitrary, capricious, and abusive of discretion as the federal rule, for the reasons discussed supra, and is thus invalid. *1327 Me.Rev.Stat.Ann. tit. 5, § 8058(1). In short, the Commissioner's pro forma compliance with some of the requirements of the state APA is no defense.
The Court concludes that, because the state rule when enacted and when applied to Haggan was more restrictive than the federal rule then in legal force, and because the state rule is arbitrary, capricious, and an abuse of discretion, it was and is invalid. The Commissioner erred in using the state rule to deny Haggan's December 1984 Medicaid application; her case will therefore be remanded to the Commissioner. Me.Rev.Stat.Ann. tit. 5, § 11007(4)(B).[10] And the Commissioner will be permanently enjoined from using the $6,000/6% rule in Medicaid eligibility determinations. Id. § 8058(1).

2. Violation of the DEFRA Moratorium

Plaintiffs next argue that the so-called "DEFRA moratorium" effectively invalidates the state rule. Section 2373(C)(1) of the Deficit Reduction Act of 1984, Pub.L. No. 98-369, 98 Stat. 494, 1112 (1984), requires that
The Secretary of Health and Human Services shall not take any compliance, disallowance, penalty, or other regulatory action against a State [for at least 18 months beginning July 18, 1984] by reason of such State's plan under title XIX of the Social Security Act being determined to be in violation of [42 U.S.C. § 1396a] (A)(10)(C)(i)(III) on account of such plan's having a standard or methodology which the Secretary interprets as being less restrictive than the standard or methodology required under such section.
Plaintiffs appear to argue that because the Commissioner could not legally adopt a state $6,000/6% rule until the federal $6,000/6% rule became procedurally valid on November 21, 1985, the Commissioner effectively adopted the state rule during the DEFRA moratorium period. And, because the Commissioner has stipulated that he would not have adopted the state rule in its present form but for pressure from then Secretary to do so, Plaintiffs argue that the state rule is invalid because it was adopted in response to action by the Secretary that violated the DEFRA moratorium.
The problem with the argument is that the Secretary pressured the Commissioner to adopt the rule in June of 1983, more than a year before the DEFRA moratorium took effect; there is no evidence of any pressure exerted during the moratorium period. Nor does the Court adopt the fiction that the Commissioner did not effectively adopt the state $6,000/6% rule until November 21. As explained above, the Commissioner in 1983 adopted the state rule to conform to the federal rule then in use; the fact that the state rule was more restrictive than the federal rule later found to have been in legal force means only that in retrospect the state rule should not have been applied, not that it was never adopted. Plaintiffs' DEFRA moratorium argument therefore fails.

IV. CONCLUSION
The Court concludes that the Secretary's use of the federal $6,000/6% rule in the Medicaid context was procedurally invalid until November 21, 1985 and arbitrary, capricious, an abuse of discretion, and in excess of the authority granted by 42 U.S.C. § 1382b(a)(3) (1982) at all times up to the present. The Commissioner's use of the state $6,000/6% rule to deny Haggan's application was erroneous because that rule was impermissibly more restrictive than the federal rule then in legal force and because it was and is arbitrary, capricious, and an abuse of the Commissioner's discretion. The Commissioner will be permanently enjoined from using his $6,000/6% rule and Haggan's case will be remanded to the Commissioner for a redetermination of her *1328 past Medicaid eligibility based on her December 1984 application and a determination of her current eligibility, both without regard to any $6,000/6% rule. The Secretary will be permanently enjoined from taking any adverse action against the Commissioner based on the Secretary's use of and/or the Commissioner's failure or refusal to use a $6,000/6% rule. As to the Commissioner's third-party claim against the Secretary, a declaration will issue that (1) until November 21, 1985 the Secretary's use of the $6,000/6% rule contained in the POMS, rather than the validly promulgated rule published at 40 Fed.Reg. 48916 (Oct. 20, 1975), violated 5 U.S.C. § 553 and 42 U.S.C. § 1382b(a)(3); and (2) thereafter the Secretary's use of the $6,000/6% rule was arbitrary and capricious, an abuse of discretion, and in excess of the authority granted by 42 U.S.C. § 1382b(a)(3). Prevailing parties may recover their costs and, because Plaintiffs have established that the Commissioner's use of the $6,000/6% rule was and is a violation of Haggan's federal statutory rights, Plaintiffs may recover, upon proper application, a reasonable attorney's fee pursuant to 42 U.S.C. § 1988 (1982).
SO ORDERED.
NOTES
[1] The Commissioner has admitted the allegation in ¶ 15 of Plaintiffs' Second Amended Complaint that Maine would not adopt a $6,000/6% rule but for the risk of sanctions imposed by the Secretary.
[2] The practical importance of this determination may lie in its effect on MAIN's claim for attorney's fees, particularly for the period from August of 1983 to April of 1985. During that period MAIN was challenging the $6,000/6% rule but Haggan had not yet sought judicial review of the Commissioner's determination that she was ineligible for Medicaid. The cases were consolidated in September of 1985. Both MAIN and Haggan have at all times been represented by counsel associated with Pine Tree Legal Assistance, Inc.
[3] The Secretary all but conceded this point in the preamble to the regulations promulgated on that date, by noting that "[c]urrent regulations do not set limits on the value of property or on the amount of income a person must get from the property ... [although] limits of $6,000 equity value and the requirement of a 6 percent annual rate of return for the exclusion of property essential to self-support are contained in operating instructions." 50 Fed.Reg. 42684 (Oct. 22, 1985).
[4] The study summary did not disclose how many of the 600 claims surveyed actually involved property worth more than $6,000; the summary did say that "[e]xcept for farms, the vast majority of [the 600] properties were valued at $6,000 or less." S.R. 172. There is thus considerable question as to whether the observed correlation between greater-than-$6,000 asset value and less-than-6% return was based on a sample large enough to have any statistical validityan important point, given that such a correlation appears to be counterintuitive.
[5] Dr. Sheehan also argues that the survey of state practices, which focused on asset value, does not support the Secretary's adoption of a rule based on equity value. But it appears to the Court that applying the $6,000 exclusion rule to a claimant's equity value, rather than the full asset value, operates to the advantage of claimants and thus provides little support for Plaintiffs' challenge to the rule. Moreover, the Secretary appears to have given full consideration to the question whether to count asset value rather than equity value, see 50 Fed.Reg. 42685 (Oct. 22, 1985), and this Court should not second-guess his conclusion.
[6] There is no need to decide whether Congress in passing section 1382b(a)(3) intended to require the Secretary to make frequent or periodic adjustments for inflation. The Court merely concludes that the failure to do so in these circumstances was arbitrary, capricious, and an abuse of the discretion vested in the Secretary by section 1382b(a)(3).
[7] In view of this disposition of Plaintiffs' statutory claims, the Court finds it unnecessary to reach Plaintiffs' constitutional claims against the Secretary.
[8] Plaintiffs also argue that the state $6,000/6% rule is impermissibly more restrictive than the federal rule promulgated on October 22, 1985 and currently in effect. Specifically, the state rule lacks two exclusions that appear in the current federal rule, one covering property temporarily producing less than a 6% return for reasons beyond the individual's control, 20 C.F.R. § 416.1222(a), and the other covering property that represents the authority granted by a governmental agency to engage in an income producing activity, 20 C.F.R. § 416.1222(b). It does not appear, however, that either Plaintiff has been adversely affected by either of these omissions from the state rule. Because Plaintiffs lack standing to bring this challenge, the Court declines to invalidate the state rule on this ground.
[9] The Court will therefore grant the Commissioner's request for a declaration that until November 21, 1985, both the state $6,000/6% rule and the federal $6,000/6% rule contained in the Secretary's POMS violated federal law.
[10] The Court declines Haggan's invitation to rule that the property her husband owns is in fact essential to self-support and should thus be excluded from her eligibility calculations. This determination is more appropriately made by the Commissioner. The Court also declines to rule on Plaintiffs' federal constitutional claims against the Commissioner, in view of the disposition of their statutory claims.